**D. W. DAWKINS, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**ASHLEY MILK CO., Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**Nos. 15566, 15567.**

United States Court of Appeals
Eighth Circuit.

Nov. 5, 1956.

Forrest M. Hemker, St. Louis, Mo. (Edward L. Wiese, St. Louis, Mo., was with him on the brief), for petitioners.

Harry Marselli, Atty., Department of Justice, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., and Lee A. Jackson, A. F. Prescott, and Kenneth E. Lev-

in, Attys., Dept. of Justice, Washington, D. C., were on the brief), for respondent.

Before WOODROUGH, VOGEL, and VAN OOSTERHOUT, Circuit Judges.

VAN OOSTERHOUT,. Circuit Judge.

These are consolidated petitions to review the decisions of the Tax Court determining tax deficiencies against petitioners, D. W. Dawkins and Ashley Milk Co. Jurisdiction is conferred upon this court by section 7482, Internal Revenue Code of 1954, 26 U.S.C.A. § 7482.

The tax liabilities asserted arise from the fact that petitioner Dawkins, while president, treasurer, and general manager of the Ashley Milk Co., a corporation, collected proceeds of corporate sales made in 1942, 1943, 1944, and 1946, aggregating $148,540.08, none of which sales were recorded in the corporation's books or included in the original income tax returns of either petitioner. In March 1947 Dawkins caused to be filed amended tax returns for Ashley Milk Co., accounting for the unreported sales, and tax and interest shown to be due in the approximate amount of $100,000 was paid. An audit disclosed that the unreported sales had been fully accounted for, and the Tax Court so found. The Tax Court found that Dawkins was the true owner of all the stock in the Ashley Milk Co.; that the proceeds of $148,540.08 in unreported corporate sales were diverted by Dawkins for his own use; that these diversions constituted constructive dividends to Dawkins to the extent of available earnings after adjustment for accrued income and excess profits taxes, and a return of capital beyond that, taxable as a long term capital gain. Dawkins' diversions by years are broken down as follows:

| Year | Amount |
| --- | --- |
| 1942 | $ 18,563.17 |
| 1943 | 45,152.11 |
| 1944 | 49,061.42 |
| 1946 | 35,763.38 |
| Total | $148,540.08 |

The Tax Court determined Dawkins' liability for income tax deficiencies for the 1942–1946 period to be $83,521.07, plus a fraud penalty of $39,521.07. The deficiencies for the same period of the Ashley Milk Co. for corporate income tax declared value excess profits tax, and excess profits tax, were $12,205.34, plus penalty for fraud and delinquency amounting to $58,279.38. Petitioners contend that the findings upon which the deficiency determinations were based are clearly erroneous.

■ The Tax Court's determination that Dawkins was the actual owner of the Ashley Milk Co.'s stock is supported by substantial evidence. Dawkins had been engaged in the dairy business since 1905. When he arranged for the incorporation of the Ashley Milk Co. in 1931, Dawkins was bound by a prior sales contract not to engage in the dairy business for five years. The $10,000 capital of the corporation was furnished by Dawkins. Ninety-eight of the 100 shares of stock issued were placed in the name of Dawkins' wife. Since 1935 Dawkins has assumed full and complete active management of the corporation and has served as president, treasurer, and general manager. Since 1935 the record stock ownership has been: Mrs. Dawkins, 95 shares; taxpayer Dawkins, 3 shares; and Dawkins' two children, 1 share each. Mrs. Dawkins' stock certificate was endorsed in blank. Mrs. Dawkins testified that she knew nothing whatever about the corporate business and had nothing to do with its management, that she did not know how many shares she owned, that she did not recall having the stock certificate, that she thought the stock certificate was at the company's offices, that she didn't recall paying anything for the stock, that she received no salary or dividends, and that her husband at all times ran the business. We do not believe that this evidence compels a finding that Dawkins made a valid completed gift of either the stock or its purchase price to his wife.

■■ For tax purposes courts look to the substance of transactions. The form

is not controlling. An essential element of a gift is an intention on the part of the donor to irrevocably divest himself of all present and future title, dominion, and control of the subject matter of the gift. Lannan v. Kelm, 8 Cir., 221 F.2d 725, 732; Scott v. Self, 8 Cir., 208 F.2d 125, 128; Schneider v. Kelm, 8 Cir., 1956, 237 F.2d 721. There is ample evidence in the record to show that at all times Dawkins retained complete control of the corporation and that he operated it to suit his own purposes. The record fully supports the Tax Court's determination that petitioner Dawkins was the actual owner of all the Ashley Milk Co. stock.

We now approach the issue of whether the Tax Court correctly treated the proceeds of the diverted sales as income of Dawkins. Dawkins' first defense to such treatment of the diversions is that the proceeds of the unreported sales remained the property of the corporation, and that they were not diverted to his personal control and use. Dawkins produced testimony to the effect that in August 1942 he rented a safe deposit box in the corporate name at the American Exchange Bank, and that most of the proceeds of the unreported sales were placed in said box. Dawkins claimed that he also deposited in this box $50,000 of his own money. This claimed $50,000 personal deposit entered into the court's decision rejecting the Commissioner's determination of additional tax liability on the net worth theory, the decision on this issue being based in part upon Dawkins' testimony purporting to show that he had $50,000 cash available, corroborated in part by testimony of his banker that he had seen Dawkins put substantial amounts of currency in his deposit box. The court states, "While we can not accept the evidence offered by petitioners as proof of any specified amount of accumulated currency on January 1, 1940, in the deposit box, it does establish that some estimated amount should have been allowed by the respondent." There has been no appeal from the Tax Court's rejection of net worth computations.

The Tax Court's finding, above quoted, with which we agree, is of some significance upon the issues before us relating to the use of money in the deposit box. Dawkins' testimony is that the cash had been accumulated as the result of sales occurring a number of years before. While the court found Dawkins had some cash available, its finding is that he did not satisfactorily establish the amount of such cash.

Dawkins' testimony is that cash, or its equivalent, from the proceeds of the unreported sales in the amount of $117,437.42 was placed in the deposit box labeled the corporate deposit box. He concedes that the proceeds of unreported sales in the amount of $31,102.66 were used by him directly for personal purposes and never reached the box. Dawkins also concedes that he withdrew from the box for personal investment and personal use, $65,128.75. On March 26, 1947, the approximate date of the amended corporate return, there remained in the box cash and securities aggregating $79,766.69, which Dawkins turned over to the Ashley Milk Co., and said funds were used by the corporation to apply upon its tax deficiency.

Taxation is more concerned with substance than with form. The command and control of the property and the enjoyment of its economic benefit are recognized as proper bases for taxation. Section 22(a) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 22(a) defines income subject to taxation in broad terms and includes "gains or profits and income derived from any source whatever." Unlawful as well as lawful gains are subject to taxation. Rutkin v. United States, 343 U.S. 130, 137, 72 S.Ct. 571, 96 L.Ed. 833; Marienfeld v. United States, 8 Cir., 214 F.2d 632, 636; Davis v. United States, 6 Cir., 226 F.2d 331, 335. In the Rutkin case in 343 U.S. at page 137, 72 S.Ct. at page 575 the Court states:

"An unlawful gain, as well as a lawful one, constitutes taxable income when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it. Burnet v. Wells, 289 U.S. 670, 678, 53 S.Ct. 761, 764, 77 L.Ed. 1439; Corliss v. Bowers, 281 U.S. 376, 378, 50 S.Ct. 336, 337, 74 L.Ed. 916. That occurs when cash, as here, is delivered by its owner to the taxpayer in a manner which allows the recipient freedom to dispose of it at will, even though it may have been obtained by fraud and his freedom to use it may be assailable by someone with a better title to it.

"Such gains are taxable in the yearly period during which they are realized. * * * "

It should be noted that no one is here contending that Dawkins committed the crime of embezzlement in obtaining the corporate funds, so we are not concerned with the question of whether the gain would be taxable if it was acquired by means of embezzlement. In any event, it is doubtful whether a person can be guilty of embezzlement of funds from a corporation which he wholly owns. Davis v. United States, supra, 226 F.2d at page 335.

The claim of right doctrine has been frequently applied in tax cases. Healy v. Commissioner, 345 U.S. 278, 73 S.Ct. 671, 97 L.Ed. 1007. In the Healy case it is stated that a claim of right exists when funds are received by the taxpayer as belonging to him. Among other things the Court states in 345 U.S. at page 281, 73 S.Ct. at page 673:

" * * * The usual statement of the rule is that by Mr. Justice Brandeis in the North American Oil opinion [North American Oil Consolidated v. Burnet, 286 U.S. 417, 52 S. Ct. 613, 76 L.Ed. 1197]: 'If a taxpayer receives earnings under a claim of right and without restriction as to its disposition, he has received income which he is required to return, even though it may still

be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent.' "

Where controlling stockholders divert corporate income to themselves it is proper to regard such diverted funds as constructive dividends for tax purposes. Chesbro v. Commissioner, 21 T.C. 123, affirmed 2d Cir., 225 F.2d 674; Christopher v. Burnett, 60 App.D.C. 365, 55 F.2d 527; Currier v. United States, 1 Cir., 166 F.2d 346.

The Davis case, supra, presents a factual situation very similar to that confronting us here. Many of Dawkins' arguments are answered adversely to him in the Davis case. The court holds that it is not necessary to consider the legality of the distribution, or to prove that the diverted cash was taxable income of the corporation. Among other things the court says 226 F.2d at page 335:

"Appellant makes . much of the fact that the government has not fixed a label of some kind on the funds that he took from his corporation. It is not necessary to describe them as additional salary, illicit bonuses, or commissions, or anything more than wrongful diversions, since, as above mentioned, substance controls over form, and taxation is concerned with the actual command over the property taxed."

It was for the Tax Court to determine as a question of fact from all the evidence whether Dawkins personally appropriated to his own use the unreported corporate income, and, if so, the time the diversions occurred. The diversions could have taken place when the checks were taken and converted into cash, or they could have occurred when cash or its equivalent was taken out of the box. The Commissioner contends that the diversions took place when the proceeds of the unreported sales first came into Dawkins' hands, and we believe that there is substantial evidence to support such con-

tention. Dawkins testified quite extensively. After stating that he had made a lot of money buying and processing milk during World War I, he states:

" * * * It takes a lot of cash to do that, and I wanted to have cash on hand if the opportunity presented itself. This was the reason I took the customers' checks and did not put them in the books of the company. * * * "

He also testified:

" * * * As the checks came in I took them and cashed them. The purpose for handling these sales in this manner was I wanted to build that candy factory, and I needed more money. I always thought I would pay it back, and I was afraid I wouldn't have money enough, so I went immediately to try to get this money. * * *

"Q. 161. The purpose then, as I understand it, to summarize, was to save money, specifically to save taxes in order to build up a surplus. Is that the idea?

"A. 161. That's right."

The fact that some of the diverted funds were deposited in a box rented by the corporation and called the corporate box is of no particular significance. Mr. and Mrs. Dawkins and their daughter had access to the deposit box. The bank records show that Dawkins visited the box 139 times alone, that he made five visits jointly with his daughter, and that his daughter made six visits. The unreported sales were represented by 46 checks. It is obvious that Dawkins made many more trips to the box than were necessary to deposit the proceeds of such checks.

■ The evidence warrants the conclusion that Dawkins had unfettered control of the proceeds of the unreported sales at all times both before and after such proceeds were placed in the deposit box. He used such funds at any time he chose for his own purposes. He was at all times in a position to enjoy the eco-nomic benefits of such funds, and he did so.

■ The status of the funds is determined as of the date of taking, and the fact that subsequent to the tax years here involved a portion of the funds was returned in no way affects Dawkins' liability for taxes in the years here in question. See Healy v. Commissioner, supra; Soreng v. Commissioner, 7 Cir., 158 F.2d 340; Mertens Law of Federal Income Taxation, Vol. 2, section 10.09, footnote 82. The Tax Court was warranted in treating the diverted sales receipts as income to Dawkins in the year in which the diversions occurred, and this result follows regardless of the label placed upon the diverted income.

■ Petitioners contend that the amounts received by Dawkins constituted payment of indebtedness of the corporation to Dawkins, and that repayment of indebtedness is not taxable. The Tax Court rejected this contention, stating in part:

" * * * Dawkins, absent evidence to the contrary, must be charged with knowledge of the balances to his credit on the corporate books, and, therefore, knew that they were less at the close of each year than the amounts withheld, even according to the records he maintained of his diversions. Lack of any notion on his part that he regarded the diversions as payment of indebtedness to him is shown by the credits he had the corporation make to the account while retaining the money for his own use."

There is no evidence that Dawkins ever returned any evidence of indebtedness of the corporation to it, that he gave the corporation any receipt, or that he had any debit entries made against his credit balances on the corporate books during any of the years here in dispute. It is a question of fact for the Tax Court as to whether Dawkins and the corporation intended the withheld funds to be applied to the corporation's indebtedness to Dawkins. Under the record here the

Tax Court was justified in resolving this issue against Dawkins so far as advances and general indebtedness are concerned.

We are inclined to feel that the unpaid salary due Dawkins, as disclosed by the corporate records, is entitled to different consideration under the facts of this case. The Tax Court found the corporation credited Dawkins' personal account with his salary for each of the years in dispute. The salary was $12,-000 per year from 1942 through 1944, and $15,000 per year in 1945 and 1946. The Tax Court also found:

> " * * * The amount credited to the account during each of the taxable years for salary was reported by Dawkins as income received in the year of credit."

Exhibit 2 contains ledger sheets on Dawkins' personal account, showing a number of debits and credits in each year. The salary credits are shown and designated, but most of the other entries are not explained. It would appear, however, that Dawkins did not draw the full salary with which he was credited.

Where a salary is credited but not withdrawn during the taxable year, the salary for tax purposes is ordinarily treated as having been constructively received, and this is particularly true where the party entitled to the salary controls the corporation. Mertens Law of Federal Income Taxation, Vol. 2, section 10.13; Beckley v. Commissioner, 12 TCM 1389.

Since under the authorities last cited Dawkins was required to treat all salary credited to his account as constructively received in the year of credit, and did so treat it in his individual returns, we are of the opinion that the Tax Court should have deducted from the diverted funds the amount of credited but unpaid salary before computing the amount of constructive dividends and return of capital. Since salaries, like dividends, are, under the circumstances disclosed here, treated as being constructively received, the salary credits here involved differ materially from the other credits to Dawkins' account. So far as we can ascertain from the record, the Tax Court made no adjustment for the salary which Dawkins constructively received and upon which he paid income tax. In this respect the Tax Court committed error. The judgment of the Tax Court should be modified to the extent that the amount of credited but unpaid salary due Dawkins during each of the years here involved, as shown by the corporate records, be treated as constructively received out of the diverted funds, and deducted from the diversions for the year in which each item of salary was constructively received. After such deduction, the balance of the diversions should be treated as constructive dividends to the extent of corporate earnings and as a return of capital for any excess above earnings. These cases should be remanded to the Tax Court to determine the constructive salary credit to be offset against the diversions and for recomputation of all taxes due after deducting the credit for constructively received salary.

Neither petitioner seriously challenges the fraud and delinquency penalties taxed in these cases, except upon the basis that no penalties are applicable because no taxes are due. We are satisfied from the record that the fraud and delinquency penalties are fully warranted. The constructive salary deduction will affect the computation of all taxes and, as heretofore stated, the taxes should be recomputed after such deduction has been made.

The decisions of the Tax Court are modified on the constructively received salary issue to the extent hereinabove indicated, and in all other respects the decisions of the Tax Court are affirmed, and these cases are remanded to the Tax Court for further proceedings consistent with the views expressed in this opinion.