**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Steven H. TOUSHIN,**
**Defendant–Appellant.**

No. 88–3509.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 7, 1989.

Decided April 6, 1990.

Thomas M. Durkin, John N. Gallo, Asst. U.S. Attys., Chicago, Ill., for plaintiff-appellee.

Thomas K. McQueen, Jenner & Block, Angelo Ruggiero, Chicago, Ill., Barry C. Scheck, Cardozo Law School, New York City, Louis Carbonaro, Carbonaro & Carbonaro, Chicago, Ill., for defendant-appellant.

Before FLAUM, RIPPLE, and MANION, Circuit Judges.

RIPPLE, Circuit Judge.

Steven Toushin was indicted in 1987 on three counts of making false statements on his income tax forms for the years 1980, 1981, and 1982, in violation of 26 U.S.C. § 7206(1). The government alleged at trial that Mr. Toushin failed to report income that he skimmed from theaters he owned. At the close of a jury trial, the district court gave several instructions concerning the government's cash expenditure method of calculating unreported income, including an instruction directing the jury to treat funds diverted by a controlling person in a corporation as income only when converted to personal use. The jury returned a guilty verdict on all three counts on October 27, 1988. We reverse and remand.

## I

## BACKGROUND

### A. *Facts*

Mr. Toushin was a partner in an enterprise that owned and operated several theaters, including the Bijou Theater in Chicago. As a result of a civil suit filed by Mr. Toushin against his partners, the assets of this partnership were placed into receivership from 1976 until March 24, 1978. An accounting system was established during the receivership to keep track of daily receipts of the theater and deposits to the company bank account. Each one hundred dollars collected for ticket sales was placed in an envelope and kept in a locked safe.

The cashier registered all receipts. At the end of the day, the money was collected by an armored-car service and deposited in the Bijou's bank account. There is evidence that, during the period of the receivership, Mr. Toushin had serious personal economic problems: he borrowed money from relatives, accumulated no savings, and took a job as a janitor with his in-laws' business.

Mr. Toushin's financial condition improved dramatically when he regained control over the Bijou in 1978. He immediately took over the Bijou's record system and personally oversaw how the deposits were made. Mr. Toushin does not dispute that he began to skim money from the Bijou receipts once he gained control of the business records in 1978. This admission was corroborated by Walter Killeen, an employee, who testified that Mr. Toushin would take money from the box office safe, count out some money for deposit, and keep the excess cash for himself. On the occasions when Mr. Killeen made the deposit, he would count out money to match a previously-prepared deposit slip and give the excess cash to Mr. Toushin. Mr. Toushin often placed the excess cash in a shoulder bag and took it home with him, or put it temporarily in a safe at the theater. All records of the gross receipts of the theater were destroyed.

Not surprisingly, the deposits from the theater started to drop when Mr. Toushin began skimming. For a nine month period ending March 23, 1978 (during the receivership), the Bijou's total gross receipts were $181,612. By contrast, after Mr. Toushin took over the theater, the gross receipts reported for the entire fiscal year ending March 31, 1979 dropped to just over $157,000. During 1978 and 1979 Mr. Toushin used cash to pay for family expenses. He gave his wife $400 (later $600) a week in "walking around money." He made cash purchases of expensive items such as a luxury automobile and a mink coat. He also paid for the family's vacations in cash.

Business greatly improved in early 1981 after Mr. Toushin finished an extensive remodeling of the Bijou theater. Until that time, the theater consisted of a small lobby, seating for fifty people, and a lounge. The second floor of the building had not been used for customers. After the remodeling, the second floor had three separate areas for customers: a video viewing area, a store selling sexual paraphernalia, and a series of booths for sexual encounters. These changes had a dramatic effect on the theater's business. The evidence submitted at trial showed that there was often a line of patrons outside the theater waiting to enter, as well as a line to get to the second floor. Receipts increased to about $30,000 each week, but the corporation formed to own the theater reported only $517,415 in receipts for the fiscal year ending March 31, 1982. Still, this amount represented roughly a three-fold increase over reported receipts of the theater before renovation.

During 1981 and 1982, Mr. Toushin opened bank accounts in the names of two of his employees and made substantial deposits into each ($23,229 and $14,385). He alone had control over these accounts. One of these employees, Walter Killeen, went to San Francisco in 1981 at Mr. Toushin's request to run another theater that Mr. Toushin owned. Mr. Toushin sent cash to pay for salaries and other necessary expenses, and directed that the San Francisco theater be remodeled in much the same way as the Bijou. Mr. Toushin paid for the remodeling work with cash or money orders.

## B. *The Trial*

### 1. The Prosecution and Defense Theories

At trial, the government called IRS Agent Dennis Czurylo to give expert testimony about the "cash method" of determining unreported taxable income. In essence, the cash method compares cash expenditures with known cash sources. Agent Czurylo testified that the method first requires that all cash expenditures be determined and added together. Then, taxable and nontaxable cash sources are added together. These sources would include any cash accumulated and on hand at the beginning of the tax period in question that the

taxpayer spends during the tax period (often called a "cash hoard"). If cash expenditures exceed cash sources during the period in question, it is inferred that the excess amount is unreported income. Tr. at 1787.[1]

Mr. Toushin's defense was that he had built up a "cash hoard" of undeposited cash prior to 1980, which accounted for the increase in expenditures over reported income in 1980 to 1982. Susan Toushin, Mr. Toushin's former wife, testified that in the summer of 1979 Mr. Toushin showed her the inside of his home safe, which was filled with currency. She also testified that Mr. Toushin told her that there was $200,-000 in cash in the safe.[2] Furthermore, defense counsel introduced testimony of a tax expert who based his calculation on the assumption that Mr. Toushin began 1980 with a cash hoard of $175,000. Tr. at 2265–66.[3]

The government countered this defense with two theories. First, Agent Czurylo testified that Mr. Toushin had little or no cash at the beginning of the tax period he examined (1980 to 1982). He based this conclusion on several factors: 1) Mr. Toushin borrowed money from relatives in 1975 and 1976; 2) he worked as a janitor in 1976; 3) he obtained no loans from his relatives after 1976; 4) his checking account was overdrawn in 1978 and 1979; 5)

he had about $75 in his checking account at the end of 1979; 6) he closed his savings account in 1979; 7) he borrowed money from his corporation (Entertainment & Amusement, Inc.) in 1979; 8) he made minimum payments on his credit cards in 1978 and 1979; 9) he failed to make timely payments on his credit cards in 1978 and 1979; 10) he paid for a plane ticket in 1979 in installment payments; 11) he was denied a loan in 1979 after furnishing a financial statement that did not list any cash as an asset; 12) he borrowed money from his in-laws in 1979 to purchase a condominium; and 13) he failed to repay family loans through December of 1979. Tr. at 1850–54.

■ Second, Agent Czurylo testified that any amount already in Mr. Toushin's safe at the beginning of the tax period in question was not "income" to Mr. Toushin that was reportable in earlier tax years. He testified that the money kept by the owner of a wholly owned business does not become his income, as opposed to that of the business, until the owner converts it to his personal use. Tr. at 1830.[4]

### 2. The Dispute on Instructions

Mr. Toushin moved to strike IRS Agent Czurylo's testimony as a misstatement of

---

**1.** We recently have stated that, in appropriate circumstances, the cash method is an admissible method of proving unreported income, so long as the government satisfies the rigorous standards associated with indirect methods of proving unreported income. *United States v. Hogan,* 886 F.2d 1497, 1509 (7th Cir.1989); *see also Holland v. United States,* 348 U.S. 121, 129, 75 S.Ct. 127, 132, 99 L.Ed. 150 (1954) (care must be exercised when proving unreported income through indirect means).

**2.** The district court struck this latter statement as hearsay. Tr. 1222–23.

**3.** This figure represented the $200,000 that Mr. Toushin allegedly told his wife was in the safe, minus $25,000 that was used prior to 1980 as a downpayment on a condominium. The Eleventh Circuit has expressed an unwillingness to allow defense calculations of starting income to be based on hearsay. *United States v. Scrima,* 819 F.2d 996, 1001 (11th Cir.1987). Since the parties did not argue this issue on appeal, we shall express no opinion at this time.

**4.** Mr. Toushin argued that this testimony represented an improper legal opinion by Agent Czurylo that should have been barred under Federal Rule of Evidence 704. We disagree. We have examined this general issue in *United States v. Windfelder,* 790 F.2d 576, 581 (7th Cir.1986), in which we approved the allowance of similar testimony by an IRS agent. The agent gave his opinion regarding the propriety of fund transfers and whether the IRS would accept such transfers as taxable. We stated that "[e]xpert testimony by an IRS agent which expresses an opinion as to the proper tax consequences of a transaction is admissible evidence. Similarly, we find that an IRS expert's analysis of the transaction itself, which necessarily precedes his or her evaluation of the tax consequences, is also admissible evidence." *Id.* (citation omitted).

Moreover, Agent Czurylo's opinion is proper as an explanation of the assumptions that underlie his calculation of the opening balance for the cash method of calculating unreported income.

the law. The district court denied this motion. Noting that Mr. Toushin was the sole owner of the corporation, the district court stated that conversion of corporate funds did not take place when Mr. Toushin took cash from the premises of the Bijou. Instead, the diversion took place "when Mr. Toushin made the determination to use the [corporate] cash for his own personal use." Tr. at 2431. To counter defense counsel's assertion that the money could be considered diverted at the moment Mr. Toushin took it from the theater, the court applied a "presumption of innocence" to infer that Mr. Toushin did not intend to skim the money when he first removed it:

> I'm giving [Mr. Toushin] the benefit of the doubt, because he's presumed to be innocent. When he took that money from Entertainment & Amusement, he did not take it with the intent to convert it for his personal use, he took it for the purpose of—applying the presumption of innocence—he took it for the purpose of storing cash for Entertainment & Amusement.

Tr. at 2432.

Consequently, the district court rejected the instruction propounded by defense counsel regarding the timing issue. That proffered instruction was:

> When corporate receipts of a controlled corporation are taken from the corporation by the controlling shareholder, not reported by the corporation, *and come under the dominion and control of said shareholder thereby being available for his personal use, said receipts are reportable as income to the said shareholder in the year that the receipts are taken, no matter that said receipts are not actually spent for his personal use until later years.*

R.150 at 7 (emphasis supplied). Instead, the district court, adopting the essential components of the government's suggested instruction, gave the following instruction to the jury:

> Where corporate funds are diverted by a person who has a controlling interest in the corporation and *are converted to the person's personal use, those diverted funds, when converted to personal use,* are dividends to the person with the controlling interest, and the funds must be reported as income by that person on his individual income tax return for the year those dividends are received.
>
> A diversion of corporate funds occurs at the time that a person who has a controlling interest in the corporation *uses or directs that those corporate funds be used for his personal use.*

Tr. 2579 (emphasis supplied). Furthermore, the government stressed during closing argument this view of when skimmed money is taxable.[5]

## II

## ANALYSIS

### A. *Tax Treatment of Skimmed Money*

On appeal, Mr. Toushin argues that the district court erred in instructing the jury as to when skimmed money from a wholly owned corporation is taxable. In assessing this claim, we must view the instructions as a whole. *United States v. Sims*, 895 F.2d 326, 329 (7th Cir.1990); *United States v. Grier*, 866 F.2d 908, 932 (7th Cir.1989); *United States v. Fournier*, 861 F.2d 148, 150 (7th Cir.1988). Moreover, we must view the instruction in the context of the entire trial. As we stated in *United States v. Bailey*, 859 F.2d 1265 (7th Cir.1988), cert. denied, —— U.S. ——, 109 S.Ct. 796, 102 L.Ed.2d 787 (1989):

> [B]ecause " 'a judgment of conviction is commonly the culmination of a trial which includes testimony of witnesses,

---

5. "[T]he other reason that you know that—that the money that she saw in the safe, that that is not essentially cash, undeposited cash that belonged to Mr. Toushin, is because the Judge will tell you that a diversion of corporate funds occurs at the time that a person who has controlling interest in the corporation uses or directs that those corporate funds be used for his personal use.... What happens is it becomes his money ... only when he uses it for his own personal interests. So if he put that money in his safe in April of '79 and then he went out and spent it in March of 1980, that's not undeposited cash that belongs to him until he actually uses it for his own personal use." Tr. 2489–90.

argument of counsel, receipt of exhibits in evidence, and instruction of the jury by the judge,'" we review the instruction in the context of the overall trial and the arguments by counsel.

*Id.* at 1277 (quoting *United States v. Piccolo,* 835 F.2d 517, 519 (3d Cir.1987), *cert. denied,* 486 U.S. 1032, 108 S.Ct. 2014, 100 L.Ed.2d 602 (1988)) (quoting *Cupp v. Naughten,* 414 U.S. 141, 147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973)). To determine whether the instructions given in this case were proper, we must first examine the substantive issue underlying this appeal: when skimmed money from a wholly owned corporation becomes taxable.

■ There is no dispute that the illegal nature of the cash—skimmed from Mr. Toushin's business—does not in itself change the fact that it should have been reported as income. As the Supreme Court held in *Rutkin v. United States,* 343 U.S. 130, 137, 72 S.Ct. 571, 575, 96 L.Ed. 833 (1952), unlawful gain is still taxable income. Mr. Toushin claims that the money became taxable to him at the time he took control over it: when he skimmed it from the business. According to this view, the cash would have been taxable to him in years prior to 1980 and, consequently, this prosecution for tax fraud in 1980, 1981 and 1982 necessarily would fail due to the expiration of the statute of limitations.[6]

The government concedes that *embezzled* money is taxable in the year embezzled. However, it argues that a sole shareholder may not "embezzle" funds from his corporation. *See Davis v. United States,* 226 F.2d 331, 335 (6th Cir.1955), *cert. denied,* 350 U.S. 965, 76 S.Ct. 432, 100 L.Ed. 838 (1956). Instead, the government asserts that money taken by the owner of a wholly owned business is not taxable until the owner *uses* the money as his own.

Since an owner may take the money for a number of legitimate reasons—storage or safekeeping, for example—the government argues that the only way to determine when the taxpayer treats the money as his own is when the taxpayer uses the money for personal benefit.[7] At oral argument, government counsel repeated this plea for a "bright-line test" in cases of skimming from wholly owned corporations. Otherwise, the government argues, it would be difficult to distinguish individuals who actually intend to skim money from individuals who undertake legitimate acts.

■ In our view, the district court should not have acquiesced in the government's request for an instruction articulating a rigid rule. Rather, the jury should have had the opportunity to evaluate all the evidence before it in light of the general rule that:

An unlawful gain, as well as a lawful one, constitutes taxable income when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it.

*Rutkin,* 343 U.S. at 137, 72 S.Ct. at 575. Income is taxable when the holder has such control over it that he has the "freedom to dispose of it at will." *Id.; see also Corliss v. Bowers,* 281 U.S. 376, 378, 50 S.Ct. 336, 337, 74 L.Ed. 916 (1930) ("income that is subject to a man's unfettered command and that he is free to enjoy at his own option may be taxed to him as his income, whether he sees fit to enjoy it or not"). Such control must be to the exclusion of any of the rights in the money asserted by the corporation. *See Commissioner v. First Security Bank of Utah,* 405 U.S. 394, 403, 92 S.Ct. 1085, 1091, 31 L.Ed.2d 318 (1972) (taxpayer must have complete dominion over money for it to be taxable). The

---

**6.** The indictment was filed in this case on March 26, 1987. The applicable statute of limitations is six years. 26 U.S.C. § 6521. This period properly includes calendar year 1980, because Mr. Toushin filed his income tax return for this year after March 26, 1981. R.1 at 1.

**7.** The government took a different position in *United States v. Scher,* 476 F.2d 319 (7th Cir. 1973), in which a physician skimmed money from his practice. The defendant cashed checks and placed the funds in a private safe. According to the defendant, the cash hoard remained in the safe until 1968, when he purchased some stock. *Id.* at 323. Nevertheless, the government alleged false tax statements for the years 1964, 1965, and 1966, *id.* at 319–20, and not in the year that the defendant spent the money for personal use.

taxpayer exercises ownership over the money when he has the power to dispose of it. *Commissioner v. Glenshaw Glass Co.,* 348 U.S. 426, 431, 75 S.Ct. 473, 476, 99 L.Ed. 483 (1955); *Helvering v. Horst,* 311 U.S. 112, 118, 61 S.Ct. 144, 147, 85 L.Ed. 75 (1940).[8] The questions of "control" and "receipt" properly are construed as questions of fact that should be left to the determination of the finder of fact.

█ The problem of proof is no doubt more difficult when this rule must be applied to the transfer of funds from a corporation to its sole owner. However, we do not believe that this difficulty justifies the substitution of a formalistic test for the jury's evaluation of the facts. It is not beyond the capability of courts and jurors to determine when an individual has exercised the sort of dominion and control over funds that would justify, under the general rule, imposing tax liability upon him. *See United States v. Curtis,* 782 F.2d 593, 596–98 (6th Cir.1986) (approving instruction that asked the jury to determine if sole shareholder of corporation had dominion and control over money to exclusion of corporation's interest); *United States v. Thetford,* 676 F.2d 170, 175 (5th Cir.1982) (noting that diversion of funds by sole stockholder without adequate report was sufficient for conviction; evidence of diversion for non-corporate purpose not essential), *cert. denied,* 459 U.S. 1148, 103 S.Ct. 790, 74 L.Ed.2d 996 (1983); *Dawkins v. Commissioner,* 238 F.2d 174, 178–79 (8th Cir.1956) (examining facts to determine if controlling shareholder diverted funds to himself in previous years); *Davis v. United States,* 226 F.2d at 335 (examining sole shareholder's entire treatment of customers' checks to determine whether he exercised personal, exclusive control); *Alisa v. Commissioner,* 35 T.C.M. (CCH) 1113, 1118 (1976) (examining facts to determine whether sole shareholder personally benefitted from diversion).[9]

Of course, the actual expenditure of funds by the taxpayer is not irrelevant to the analysis. Indeed, such expenditures are highly relevant to and probative of the determination of whether the taxpayer had the absolute control necessary for the funds to constitute income. However, as the cases in the preceding paragraph amply demonstrate, the ultimate issue is *control*—not expenditure. For instance, in *Dawkins,* the defendant placed money belonging to his wholly owned corporation in a safe deposit box. The evidence indicated that the defendant used money from this box for his personal expenses, and none of the money was reported to the IRS. These facts permitted a conclusion that the defendant had exercised dominion and control over all the money, and, consequently, the court properly found that all the money was immediately taxable:

> The evidence warrants the conclusion that Dawkins had *unfettered control* of the proceeds of the unreported sales at all times both before and after such proceeds were placed in the deposit box. He

**8.** We also note that the Internal Revenue Code provides that money received as a dividend from a corporation is taxable. 26 U.S.C. § 301. *See generally United States v. Miller,* 545 F.2d 1204, 1211 (9th Cir.1976), *cert. denied,* 430 U.S. 930, 97 S.Ct. 1549, 51 L.Ed.2d 774 (1977). Furthermore, the regulations make clear that the dividend is taxable when the money "is unqualifiedly made subject to [the shareholder's] demands." 26 C.F.R. 1–301–1(b).

**9.** In *United States v. Dixon,* 698 F.2d 445 (11th Cir.1983), the Eleventh Circuit decided an analogous case regarding taxation of ill-gotten gains. The defendant received money from a client in his insurance business. He claimed that he "received" the money in the year that he deposited the money in a bank account over which he had unfettered control, and thus the statute of limitations barred prosecution. The govern-

ment contended that he did not actually "receive" the money until the following year, when it was clear that the true owner would not make a claim for it. After analyzing *Rutkin,* the court found that, "[a]lthough Dixon had formal legal control over the funds in 1975, *Rutkin* emphasizes that Dixon did not 'receive' the funds for tax purposes until he obtained practical control of them." *Id.* at 446. The court further approved the district court's jury instruction stemming from *Rutkin:* "Accordingly, if you should find ... that defendant, over all the facts and circumstances of the case, did not have *actual* intent and the *actual* ability to exercise control over these funds until 1976, then you may consider such funds to be taxable income to the defendant in calendar year 1976." *Id.* at 466 n. 1 (emphasis in original).

used such funds at any time he chose for his own purposes. *He was at all times in a position to enjoy the economic benefits of such funds,* and he did so.

"The status of the funds is determined as of the date of taking.... The Tax Court was warranted in treating the diverted sales receipts as income to Dawkins in the year in which the diversions occurred...."

238 F.2d at 179 (emphasis supplied). Similarly, the Sixth Circuit in *Davis v. United States* treated the funds taken by a sole owner of a corporation and placed in his own safe or bank account to be taxable as of the time he had control over it. "Control" did not require that the defendant spend the misappropriated funds, merely that he treated the funds as his own:

[T]hrough the fraudulent transactions in which he was engaged, he received the cash over which he had complete control, which he took as his own, treated as his own, which resulted in economic value to him, and for which he probably never would have been required to account, had it not been for the discovery of the fraud on the revenue which he was perpetrating.

226 F.2d at 335.[10]

Finally, the Fifth Circuit in *United States v. Thetford* decided a similar tax evasion case involving the owner of a wholly owned corporation. The government alleged that the taxpayer had skimmed about $100,000 in 1973 and 1974 from his corporation. The taxpayer claimed that he did not take the money for personal use; rather, he "merely held and disbursed the funds for the corporation." 676 F.2d at 175. The court rejected the taxpayer's argument

that the burden was on the government to show that he had spent the money for non-corporate purposes. "Once a taxpayer has taken control of funds diverted from a corporation and then fails to report such funds as income or to make any adjustment in the corporate books to reflect a return of capital, that is sufficient to imply willful intent to evade taxes." *Id.; see also United States v. Wilson,* 887 F.2d 69, 73 (5th Cir.1989) (government need not prove that money diverted from corporation by its two owners was spent for non-corporate purpose).

### B. *Application to this Case*

■ The district court's instruction on taxable income effectively removed from the jury the ability to determine whether Mr. Toushin had "control" over the alleged cash hoard prior to 1980. This impermissible shift in focus easily could have led to juror confusion regarding how to treat the alleged cash hoard. The infirm instruction certainly negated any salutary effect of another instruction:

If you find that the defendant had a prior accumulation of cash prior to the years in question which was used for expenditures over and above his income for the years in question, you must find him not guilty.

Tr. 2579. Consequently, the jury may have concluded that a cash hoard existed prior to 1980, but nevertheless convicted Mr. Toushin because he did not spend the money until later. We hold, therefore, that the district court erred in instructing the jury that money skimmed from a wholly owned business is not taxable until it is spent for personal use.[11]

---

**10.** The court in *Davis* recited the instruction given by the district court to the jury:

The district court charged the jury that the income in question was received, in the first instance, by the corporation, of which appellant was president, treasurer, and sole stockholder; that money received by a corporation was not income to an individual unless the corporation funds were in some way transferred or diverted to the individual, and became property over which he exercised dominion and control and treated as his own, to the exclusion of any interest therein by the corpo-

ration; and if they found that appellant, as the sole owner of the corporation, diverted funds of that corporation to himself personally and exercised control over them and treated them as his own, that would constitute taxable income that he was required by law to include in his income tax returns.

226 F.2d at 333–34.

**11.** A party must object to a proposed instruction prior to the time that instruction is given to the jury. Fed.R.Crim.P. 30. Mr. Toushin's counsel specifically objected to the timing instruction during the conference called by the district

## C. *Harmless Error*

Having determined that the instruction given to the jury was erroneous, we must now consider whether that error was harmless. Rule 52(a) of the Federal Rules of Criminal Procedure requires that any error that "does not affect substantial rights shall be disregarded." Our determination of whether a non-constitutional error is harmless focuses on the effect the error may have had on the jury's decision. *See Hamling v. United States*, 418 U.S. 87, 108, 94 S.Ct. 2887, 2903, 41 L.Ed.2d 590 (1974) (determined whether error in instruction "would have materially affected the deliberations of the jury" when error was non-constitutional); *Kotteakos v. United States*, 328 U.S. 750, 764, 66 S.Ct. 1239, 1247, 90 L.Ed. 1557 (1946) (question when there is non-constitutional error is "what effect the error had or reasonably may be taken to have had upon the jury's decision"); *United States v. Zapata*, 871 F.2d 616, 622 (7th Cir.1989) (examined effect of erroneous instruction on the jury); *United States v. Manganellis*, 864 F.2d 528, 539 (7th Cir.1988) (error harmless only if it had no effect or slight effect on jury). Our standard has long been established:

> [I]f one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

*Kotteakos*, 328 U.S. at 765, 66 S.Ct. at 1248. *See also United States v. Lane*, 474 U.S. 438, 449, 106 S.Ct. 725, 732, 88 L.Ed.2d 814 (1986); *Zapata*, 871 F.2d at 622.

The government asserts that, even if the court instructed the jury incorrectly on the issue of how to treat cash "hoarded" prior to 1980, the error was harmless. In essence, the government contends that the evidence showed that Mr. Toushin did not have a cash hoard, so that all the unreported cash came from the period beginning in 1980. The evidence presented by Agent Czurylo indicated that Mr. Toushin suffered from economic troubles as late as 1979. In particular, the fact that he failed to repay loans made to him from his family and that he failed to make several credit card payments while keeping a low balance in his checking account point to financial trouble. This evidence, the government asserts, strongly indicates that Mr. Toushin did not have a cash hoard at all.

"Neither the government in its investigation nor the jury at trial were bound to accept the 'cash hoard' claim at face value in view of various opposing considerations, including the defendant's prior unimpressive personal and financial circumstances." *United States v. Marrinson*, 832 F.2d 1465, 1471 (7th Cir.1987). The question of accepting the cash hoard theory was "a factual jury question." *Id.* Evidence of economic need, such as the thirteen elements to which Agent Czurylo testified in this case, can support a finding that there was no cash hoard as alleged by a defendant. *See Holland v. United States*, 348 U.S. 121, 133–34, 75 S.Ct. 127, 134–35, 99 L.Ed. 150 (1954); *United States v. Blandina*, 895 F.2d 293, 301–02 (7th Cir.1989). In this case, however, the district court essentially prevented Mr. Toushin from presenting his cash hoard theory to the jury. Thus, while the jury *may* have believed that Mr. Toushin did not have a cash hoard, we cannot ignore the possibility that the jury convicted him based on the erroneous instruction of when diverted funds become taxable. It is, therefore, impossible to find that the erroneous instruction in this case was harmless error.

## Conclusion

We reverse the conviction of Steven Toushin and remand this case to the dis-

court to discuss jury instructions. Tr. 2430–35. We therefore conclude that Mr. Toushin sufficiently has preserved his objection for appeal. *See United States v. Kuecker*, 740 F.2d 496, 502–03 (7th Cir.1984) (although the defendant's instruction was deficient, objection made to instruction actually given can be sufficient for appeal).

trict court for proceedings consistent with this opinion.[12]

REVERSED AND REMANDED

---

**12.** As an alternate ground for reversal, Mr. Toushin argues that he was prejudiced by the prosecution's references to the fact that his business was geared to adult male homosexuals, that it involved pornography, and that the nature of the encounter booths may have been a threat to the public health by facilitating the spread of AIDS. Mr. Toushin argues that this prejudicial evidence should have been excluded in accordance with Federal Rule of Evidence