**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellant,</u>

v.                                                                                    No. 99-4722

CURTIS JAMES LEAK,
<u>Defendant-Appellee.</u>

Appeal from the United States District Court
for the Western District of North Carolina, at Charlotte.
Graham C. Mullen, Chief District Judge.
(CR-93-255-MU)

Argued: June 9, 2000

Decided: September 20, 2000

Before MICHAEL and TRAXLER, Circuit Judges, and
BUTZNER,* Senior Circuit Judge.

_____

Reversed and remanded by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Frank DeArmon Whitney, Assistant United States Attorney, Charlotte, North Carolina, for Appellant. Michael Smith Scofield, Charlotte, North Carolina, for Appellee. **ON BRIEF:** Mark T.

_____

*Senior Judge Butzner heard oral argument in this case but did not participate in the decision. The opinion is filed by a quorum of the panel. 28 U.S.C. § 46(d).

Calloway, United States Attorney, Brian Lee Whisler, Assistant United States Attorney, Charlotte, North Carolina, for Appellant.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

A jury found Curtis James Leak (Leak) guilty of conspiring against the Internal Revenue Service and of income tax evasion for three years. The district court set aside the verdict and, in the alternative, granted Leak a new trial. See United States v. Leak, No. 3:93-CR-255-1MU, 1999 WL 1940037 (W.D.N.C. Sept. 8, 1999). The United States appeals. We reverse the district court and remand the case for sentencing.

I.

On August 1, 1994, Leak and his wife, Karen, were charged in a superseding indictment with one count of conspiracy to defraud and impede the IRS in its collection of revenue, in violation of 18 U.S.C. § 371; four counts of income tax evasion for the years 1987 through 1990, in violation of 26 U.S.C. § 7201; and seven counts of structuring or causing a currency transaction report not to be filed, in violation of 31 U.S.C. §§ 5324(1), 5324(3), 5322(a); 26 U.S.C. § 7203. The district court granted Karen Leak's motion to sever her case. The court dismissed the structuring counts on April 9, 1997, and the case went to trial against Leak.

The government offered the following evidence. On January 17 and 18, 1991, the Leaks made thirty-three cash deposits in twenty-one separate branches of three Charlotte-area banks. The deposits were made in three accounts, two in Leak's name and one in Karen Leak's name. The deposits amounted to $152,300 and ranged in size from

2

$2,500 to $5,200.**1** Over six days in March and April 1991 the Leaks made an additional fourteen cash deposits at nine different branch locations of one of these banks, for a total deposit of $54,110. Once again, the individual deposits were for no more than $5,000.

The IRS's Criminal Investigation Division commenced an investigation after learning about these questionable deposits. After reviewing the Leaks' financial history and records, the IRS concluded that the deposits did not come from nontaxable income. In 1986 the Leaks had filed for Chapter 13 bankruptcy, declaring a negative net worth of approximately $19,000. At that time they had no cash, they were behind on loan payments, and the mortgagee on their house was considering foreclosure. Karen Leak had asked her employer for cash advances on several occasions in 1986. In that same year Curt Enterprises, a corporation owned by Leak, filed for Chapter 11 bankruptcy and ultimately liquidated under Chapter 7. In 1987 Curtis Leak had his car repossessed. Finally, the Leaks were under a five-year bankruptcy plan to pay off their debts by 1991.

The Leaks reported only modest income on their tax returns for the years leading up to 1991, when the structured cash deposits were made. Specifically, for 1986 through 1990 the Leaks reported on their joint returns a total of $123,220.52 in taxable net income, a figure that was considerably short of the $206,410 in cash deposits made by the Leaks in the first four months of 1991. Prior to the cash deposits the Leaks did not have any significant source of legal nontaxable income, such as an inheritance.

In the course of the IRS's investigation, agents interviewed Leak on three occasions. He told the agents that the cash deposited in 1991 was a loan from his corporation, TKC, Inc, which ran a night club called "Side Effects." Leak claimed that TKC's cash was stored in safes in his house because he "did not trust banks." According to Leak, the Leaks borrowed the cash from TKC in order to pay off their home mortgage and to finance an addition to their home. He claimed that he had intended to refinance his mortgage and use the proceeds from the refinancing to repay the loan to TKC. He claimed that he

_____

**1** A bank must file a currency transaction report with the IRS whenever a cash transaction exceeds $10,000. See 31 C.F.R. § 103.22.

made the many smaller cash deposits rather than a single deposit because he did not want to draw attention to himself and because he was afraid of being robbed.

In these interviews the IRS also asked both of the Leaks about the status of TKC's tax returns. Karen Leak, an accountant for a power company, usually prepared the couple's personal and corporate tax returns. She told the IRS that she had already filed returns for TKC for 1986 through 1989 and that she had filed an extension for the 1990 corporate return. At that time, however, none of the returns had been filed.[2] TKC's corporate income tax returns for 1987, 1988, and 1989 were not filed until July 22, 1991, nineteen days after the IRS's last interview with Leak. A return for 1986 was never filed.

Several items of documentary information contradicted Leak's claim that the 1991 cash deposits represented a loan from TKC. First, none of TKC's corporate records mention any such loan. Second, TKC filed its income tax return on IRS Form 1120-A, which requires the corporation to list any "Loans to stockholders." The loan did not appear on TKC's returns until the 1992 return, which was filed after the Leaks had been indicted. Moreover, TKC's tax returns revealed that TKC generated only $17,693 in total net taxable income for the period of 1987 through 1989, a very small sum compared to the $206,000 in cash deposits in early 1991. Third, Leak denied the existence of any loan in an interrogatory answer in a civil forfeiture proceeding arising out of these events. On June 21, 1991, the United States instituted a civil forfeiture proceeding against the Leaks' house and car. See United States v. Leak, 123 F.3d 787 (4th Cir. 1997). In that action Leak answered a series of interrogatories about his finances. One interrogatory asked him to disclose his salary and "each and every other source of payment or income received whether earned

---------------------------------------------------------------

[2] The IRS also requires employers to file annually a Form 940, which reports the total amount of wages paid to employees. This information must be provided quarterly on a Form 941. See 26 C.F.R. § 31.6011(a)-(3), (4). TKC had filed virtually none of these employment tax forms. From 1986 through 1995 the corporation did not file any IRS Forms 940 and filed only three quarterly IRS Forms 941. Three former Side Effects employees testified that they were paid their salary in cash and were never provided W-2 forms.

4

or unearned, by you from any source(s) since January 1, 1985, including but not limited to proceeds from . . . loans, or lines of credit." Leak did not list any loan from TKC.

Central to the government's case was the expert testimony of IRS Agent David Walden. Agent Walden used a net worth and expenditure analysis to opine that the Leaks had been underreporting their income for several years prior to their cash deposits in early 1991. Walden explained that "net worth and expenditure analysis" is a "method of determining income by looking at the increase or decrease in net worth from the beginning of a period to the end of a period, and then . . . mak[ing] necessary adjustments for personal living expenses and subtract[ing] out nontaxable sources of income." In a net worth analysis it is essential to determine the initial net worth with reasonable accuracy. The Leak case presented a particularly appropriate case for net worth analysis because the Leaks provided a list of their assets and liabilities under oath when they filed for bankruptcy in 1986. Because of the ease in determining the Leaks' net worth at the time of bankruptcy, Agent Walden began his analysis in 1986, when the bankruptcy filing showed a negative net worth of $18,981.35. (Leak's expert agreed with the accuracy of this figure.)

Walden then calculated the value of Leak's assets for each year from 1986 through 1990. He divided the assets into two categories: cash on hand[3] and all other assets. Agent Walden estimated the cash on hand at the end of 1990 at $194,030.93. To arrive at this figure, Walden established that the Leaks had spent $338,419.41 in the first four months of 1991. At the beginning of 1991 the Leaks had $144,388.48 in funds available in bank accounts, gross receipts from Side Effects, and Karen Leak's salary. The amount spent, $338,419.41, less the amount in known funds available, $144,388.48, left the amount of cash on hand at $194,030.93 at the end of 1990. Walden said that this figure was conservative because his calculation would not capture any hidden cash that was not spent by the Leaks. Walden then had to estimate how much of this cash had been accumulated each year. Walden explained that Leak had admitted accumulating the cash he deposited in 1991 from 1987 through 1990. The

_____

[3] Cash on hand refers to the amount of money a person has in actual, physical cash.

bankruptcy documents showed that the Leaks had no cash on hand in 1986. Leak admitted to IRS investigators that beginning from March 1987 to July 1989 he had accumulated $10,000 to $15,000 in cash on hand. Walden took the average of these numbers and estimated that Leak had $12,500 of cash on hand in July of 1989. Walden, therefore, concluded that Leak had accumulated $12,500 from March 1987 through July 1989 and $181,530.93 from July 1989 through the end of 1990. Walden's next step was allocating how much of the $12,500 was accumulated in 1987, 1988, and 1989 and how much of the $181,530.93 was accumulated in 1989 and 1990. Walden explained that the most accurate method of allocating these amounts was to assume that the amounts fluctuated with the gross receipts of TKC. In other words, the more cash Side Effects was generating, the more cash Leak was likely to be storing in his safe. By using the gross receipts figures that TKC reported to the North Carolina Alcohol Beverage Control Board, Walden arrived at a cash on hand estimate for Leak for the years 1987 through 1990.

Walden then calculated the value of Leak's other assets. These assets included cars, bank accounts, and home furnishings. Walden explained why he attributed certain assets to Leak rather than to TKC. For example, Walden said that he attributed the value of a Porsche in Leak's possession to Leak even though the car was titled in the name of TKC and Karen Leak. The Porsche was attributed to Leak in part because the car was not listed on the balance sheet in TKC's corporate tax returns and because Leak told the Porsche salesperson that the car was for personal use. Leak also stipulated to his ownership of several assets.

With the value of the Leak's assets calculated for each year between 1987 and 1990, Walden's next step was to compare the value of Leak's assets with the amount of his liabilities. After comparing assets with liabilities, Walden calculated the increases in net worth from 1987 through 1990. He calculated the increases as $37,538.82 for 1987, $94,902.50 for 1988, $53,022.70 for 1989, and $136,522.40 for 1990.

Walden next calculated the amount of tax underreported by Leak. Walden calculated adjusted gross income by adding increases in net worth to personal expenses and by subtracting nontaxable sources of

6

income. After calculating adjusted gross income for each year from 1987 through 1990, Walden was then able to show that Leak substantially underreported his taxable income in each year from 1987 through 1990. Walden concluded that Leak underreported his taxable income by $35,107.14 in 1987, $73,639.53 in 1988, $40,480.59 in 1989, and $124,260.50 in 1990.

Leak offered a defense. He testified that the cash deposited in 1991 was the result of a loan from TKC. He said that when he got his first job after college, he kept his salary in a football helmet, rather than a bank, because he distrusted banks. Leak said that his distrust of banks stemmed from his early life in the projects, where he learned that "you wouldn't trust people." He testified that he planned to repay TKC after he refinanced his mortgage. Leak also disputed Walden's effort to attribute certain assets to him rather than to TKC in the net worth analysis. For example, Leak claimed that Walden incorrectly attributed a First Federal Savings bank account to him. Leak explained that even though the bank account was in his personal name, the account was TKC's. Leak presented an expert who testified that if the disputed assets were attributed to TKC rather than to Leak, Leak overpaid his taxes for 1987, 1989, and 1990 and minimally underreported his income for 1988.

The jury took about six hours to find Leak guilty of conspiracy and of tax evasion for 1988, 1989, and 1990. The jury acquitted him of tax evasion for 1987. Thereafter, Leak made a post-verdict motion for an acquittal, which the district court granted. The district court (on its own motion) granted him a new trial, in the alternative.

The district court offered four reasons for granting a judgment of acquittal. First, the district court concluded that the evidence was insufficient to prove that the cash Leak held in his safe was income to him in the years charged in the indictment. See Leak, 1999 WL 1940037, at *2-*3. The court said that before 1991 the evidence showed that Leak did nothing more than hold the cash in his safe for TKC and therefore the cash was not income to him. See id. Second, the court concluded that Agent Walden's net worth analysis was faulty because he allegedly used $12,500 as his starting point for cash on hand. See id. at *4. Further, the court criticized Walden's use of Side Effect's gross receipts rather than net income in apportioning

7

cash on hand among the years charged in the indictment. See id. at *3. Third, the court concluded that the government failed to distinguish adequately between TKC's corporate and Leak's personal assets, thereby inflating the amount of Leak's personal income. See id. at *4. Fourth, the court held that in light of the insufficient evidence to sustain the tax evasion counts, the case of Yates v. United States, 354 U.S. 298, 311-312 (1957), mandated overturning Leak's conspiracy conviction. See Leak, 1999 WL 1940037, at *5. The government appeals.

II.

When we assess the sufficiency of the evidence in a criminal conviction on direct review, "[t]he verdict of[the] jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." Glasser v. United States, 315 U.S. 60, 80 (1942). We review de novo the district court's grant of a post-verdict acquittal. See United States v. Campbell, 977 F.2d 854 (4th Cir. 1992). We are not entitled to weigh the evidence or to assess the credibility of witnesses, but we must assume that the jury resolved all contradictions in favor of the Government. See United States v. Romer, 148 F.3d 359, 364 (4th Cir. 1998), cert. denied , 525 U.S. 1141 (1999).

The district court erred by acquitting Leak and granting him a new trial. We begin with the tax evasion counts. In order to prove a violation of 26 U.S.C. § 7201, the government must show beyond a reasonable doubt (1) willfulness, (2) the existence of a deficiency, and (3) an affirmative act constituting evasion or attempted evasion of tax. See Sansone v. United States, 380 U.S. 343, 351 (1965). The district court's first conclusion was that for the years charged in the indictment the government presented insufficient evidence that the cash Leak held in his safe was personal income because he did not spend the cash until 1991. See Leak, 1999 WL 1940037, at *2-*3. In the words of the district court, "The evidence presented at trial showed that during the years for which he was convicted, Mr. Leak: 1) Was merely holding the corporate funds in his safe; 2) Was charged with this function as one of his corporate duties; and 3) Had not used any of these funds for personal expenditures." Id. at *2. Finally, the dis-

8

trict court concluded that the funds were not transferred to Leak until 1991, when Leak says TKC loaned him the money.

We cannot agree with the district court. The jury could have rationally concluded that there was no loan from TKC to Leak in 1991. Leak acknowledged that there was no loan in answering an interrogatory in January 1992 in the civil forfeiture proceeding. TKC's corporate balance sheets did not reveal a loan. TKC's tax returns did not mention any loan to a stockholder until the 1992 return was filed in November 1994, after the Leaks had been indicted. The suspicious manner in which Leak made the deposits is also evidence that there was never a loan.

Once the jury concluded that there was no loan in 1991, the jury could then have rationally concluded that the cash hoarded by Leak in his personal safes was personal income in 1988, 1989, and 1990, even if Leak did not spend any of this money until 1991. The ultimate issue in determining whether corporate funds become personal income is "control," not "expenditure." United States v. Toushin, 899 F.2d 617, 624 (7th Cir. 1990). As the Fifth Circuit has explained, "The burden . . . does not lie upon the Government . . . to show how the funds were spent. Once a taxpayer has taken control of funds diverted from a corporation and then fails to report such funds as income or to make any adjustment in the corporate books to reflect a return of capital, that is sufficient to imply willful intent to evade taxes." United States v. Thetford, 676 F.2d 170, 175 (5th Cir. 1982).

Leak admitted to accumulating the cash he spent in 1991 from 1987 through 1990.[4] Leak's substantial expenditures in 1991 are evidence that Leak treated the cash he hoarded as his and not TKC's. In other words, the jury could have concluded that Leak's decision to spend corporate funds for personal use did not originate with his expenditures in 1991 but rather with his storing of cash in his safes beginning in 1987. The fact that Leak stored this cash in his personal safes rather than a bank account is evidence that Leak treated this cash as his own. The jury could have rationally disbelieved Leak's claim that he was storing TKC's cash in his safes rather than in a bank

_____

[4] Agent Walden estimated that Leak accumulated $132,517.58 in 1990, $53,388.35 in 1989, and $5,500.00 in 1988.

9

because he distrusted banks. Indeed, Leak did not give consistent testimony regarding his alleged distrust of banks. Leak vigorously argued at trial that a bank account containing a balance of $84,324 in December 1988 was TKC's, even though the amount was in his name.**5** The jury could have concluded that by arguing that this $85,000 bank account was really TKC's, his claim that he distrusted banks was not genuine. We also note that there was evidence that Leak spent some of TKC's cash prior to 1991 as the Leaks spent significantly more than their reported income in 1988, 1989, and 1990.

The district court also acquitted Leak for the tax evasion charges because the court concluded that the government had introduced insufficient evidence to prove that certain assets were Leak's as opposed to TKC's. See Leak, 1999 WL 1940037, at *4. While it is true that Agent Walden's conclusions hinged on identifying certain assets as Leak's rather than TKC's, Walden explained to the jury why those assets should be attributed to Leak. For example, Leak argued that a bank account at First Federal was TKC's and not his. Walden treated the bank account as Leak's because the bank account was in Leak's name and not TKC's. Moreover, Leak's failure to file tax returns for TKC or to maintain complete corporate records discredits his claim that certain assets were not his. Thus, the jury could have rationally concluded that the disputed assets were Leak's and not TKC's.

Finally, the district court erroneously concluded that Agent Walden's net worth analysis was sufficiently faulty to warrant an acquittal. The district court stated that Walden's analysis was flawed because he "arbitrarily" chose $12,500 as his starting point for calculating cash on hand. See id. In fact, Walden used zero as his starting point.**6** The $12,500 figure was used in 1989, not as the starting point in 1987. The district court also criticized Walden for using Side Effect's gross receipts, as opposed to net income, in apportioning the

_____

**5** At trial when Leak was asked about this account, not only did he not mention his distrust of banks, but he said he put TKC's money in the bank to earn interest.

**6** Actually, using $12,500 rather than zero would have benefitted Leak because a higher starting point would have yielded a lower increase in net worth.

amount of cash Walden accumulated from 1987 to 1990. See id. at *3. While taking expenses into account might have yielded a more accurate apportionment, there is no evidence that the amount of expenses varied disproportionately with the amount of gross receipts during the relevant years. We cannot conclude that Walden's analysis was prejudicial. See United States v. Terrell, 754 F.2d 1139, 1146 (5th Cir. 1985) (stating that cash on hand "need not be proved with mathematical exactitude, but . . . must be established with reasonable certainty").

The evidence, when taken in the light most favorable to the government, is sufficient for the jury to have concluded that Leak evaded his income taxes in 1988, 1989, and 1990. The district court therefore erred in granting Leak a post-verdict judgment of acquittal on the tax evasion counts.

We now turn to the conspiracy conviction, which the district court also overturned. The jury found Leak guilty of conspiring with his wife, Karen, to evade the payment of income taxes. The conspiracy was accomplished, according to the government's proof, by the actual tax evasion in 1988-90 charged in the substantive counts and by the Leaks' activities in 1991, including the elaborate scheme of many small bank deposits. The district court decided that a judgment of acquittal was required on the conspiracy count because of the Supreme Court's opinion in Yates v. United States, 354 U.S. 298 (1957). See Leak, 1999 WL 1940037, at *5. In Yates the Court held that a verdict must be set aside "where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected." Id. at 311-12. The district court reasoned that because the evidence was insufficient to convict Leak on the tax evasion counts, there was a significant risk that the jury convicted Leak for conspiracy based on its verdicts of guilt on the tax evasion counts covering 1988 through 1990. Therefore, even though there was other evidence, such as the deposit and spending activity in 1991 to support the conspiracy conviction, the conviction could not stand.

We reverse the district court for several reasons. First, because the tax evasion counts are supported by sufficient evidence, there is no concern about juror confusion. Second, the district court misapplied Yates. Yates has been limited to cases where the impermissible ground on which the jury might have relied was constitutional or legal

11

error rather than sufficiency of the evidence. A general verdict of guilt is not to be set aside "because one of the possible bases of conviction . . . [is] merely unsupported by sufficient evidence." Griffin v. United States, 502 U.S. 46, 56 (1991). Therefore, even if there was insufficient evidence to support the tax evasion counts, Yates would be inapplicable. Rather, the question would be whether there was sufficient evidence apart from the alleged tax evasion in 1988, 1989, and 1990 to sustain the conspiracy conviction. The Leaks' activities in 1991 would clearly support a conspiracy conviction. The jury could have rationally believed that there was no loan from TKC and that the Leaks agreed to (and did) undertake the extensive series of smaller deposits to conceal their use of over $206,000 in corporate funds for personal use. The jury could also have rationally concluded that the Leaks did this in order to impede or defraud the IRS in its collection of revenue. The 1991 activity is distinct from the tax evasion in prior years because, to establish the conspiracy, the government is not required to prove that Leak treated this cash as his own prior to 1991. As a result, both the tax evasion in 1988-90 and the Leaks' activities in 1991 independently support the conspiracy conviction. For these reasons, the district court also erred in granting Leak a judgment of acquittal on the conspiracy count.

III.

This case is simply about the strength of the government's evidence. Because the evidence is sufficient to support Leak's conviction on the three counts of income tax evasion and the one count of conspiracy, there was no basis for the district court (on its own motion) to grant Leak a new trial. We reverse the judgment of acquittal and reinstate the jury's verdict. The case is remanded for sentencing.

REVERSED AND REMANDED

12