**Request for Removal from Asbestos
Registry and for Leave to File Complaint**

1. Claimant's Name: _____
 Last First Middle

2. Date original Claimant Registry Form was filed:
_____

3. I hereby request removal of the above-captioned claim from the Registry.

4. The specific asbestos related condition(s) claimed is/are:
_____

5. The reasons for this request are as follows (here state the specific reasons for removal, specifying which criteria have been satisfied):
_____
_____
_____
_____

6. The following documentation required by the Registry order is attached "hereto in support of this request:

_____ dated _____
_____ dated _____
_____ dated _____
_____ dated _____
_____ dated _____

7. I certify that the foregoing information is true and correct, and hereby request that the above-named claimant's case be removed from the Registry and that leave be granted to file a complaint.

Dated _____ _____
 CLAIMANT OR CLAIMANT'S COUNSEL

Certificate of Service

**In the Matter of the SEARCH OF
4330 NORTH 35TH STREET,
MILWAUKEE, WISCONSIN.**

No. 91–45M.

United States District Court,
E.D. Wisconsin.

April 6, 1992.

Robert E. Meldman, Reinhart, Boerner, Van Deuren, Norris & Rieselbach, S.C., Milwaukee, Wis., for movant.

Matthew V. Richmond, Asst. U.S. Atty., Milwaukee, Wis., for respondent.

## DECISION AND ORDER

GOODSTEIN, United States Magistrate Judge.

On May 21, 1991, a search warrant was issued by this court authorizing the government to search the premises located at 4330 N. 35th Street in Milwaukee, Wisconsin, for evidence of violations of 26 U.S.C. §§ 7201 and 7203 by Bee Bus Lines Inc. The government executed the search three days later, on May 24, 1991. Among the items seized was currency in the amount of $111,-739 which was taken from a safe in the basement.

On October 10, 1991, James A. Pittman filed a motion pursuant to Rule 41(e) Fed. R.Crim.P. for the return of the cash. Pittman, a shareholder of Bee Bus Lines, claims that the money was taken from his personal safe, that the money belongs to him, and that the government does not have any reason or right to retain the money.

On November 18, 1991, this court issued an order, in which the court found that it had jurisdiction under Fed.R.Crim.P. 41(e), and scheduled the matter for an evidentiary hearing on November 26, 1991. Testifying at the hearing were special agent Mi-

chael Spang and James Pittman. At the conclusion of the hearing, the court granted the parties leave to file post-hearing briefs. With all briefing now completed, this matter is ready for resolution.

### I. *Magistrate Judge's Jurisdiction*

As a preliminary matter, the government submits that this court lacks subject matter jurisdiction to entertain this motion under Rule 41(e) Fed.R.Crim.P. Rule 41(e) provides as follows:

> **Motion for Return of Property.** A person aggrieved by an unlawful search and seizure or by the deprivation of property may move the district court for the district in which the property was seized for the return of the property on the ground that such person is entitled to lawful possession of the property. The court shall receive evidence on any issue of fact necessary to the decision of the motions. If the motion is granted, the property shall be returned to the movant, although reasonable conditions may be imposed to protect access and use of the property in subsequent proceedings. If a motion for return of property is made or comes on for hearing in the district of trial after an indictment or information is filed, it shall be treated also as a motion to suppress under Rule 12.

The government argues that a magistrate judge does not have jurisdiction to consider the merits of a motion seeking the return of property which is filed under the magistrate judge's docket. The government argues that the only forum available to Pittman is to file an independent civil action or await the filing of a criminal case. In support of its position, it cites the case of *In the Matter of the Search of 6731 Kennedy Avenue*, 131 F.R.D. 149 (N.D.Ind. 1990).

The government quotes the language from *6731 Kennedy Avenue*, which states that "a motion seeking the return of property may be filed either in the pending criminal case or as an independent civil action ... This Court does not have jurisdiction to consider the merits of a motion seeking the return of seized property filed under the case number on the Magistrate's docket." *6731 Kennedy Avenue*, 131 F.R.D. at 150, 151. The government, in

effect, has raised two issues relating to jurisdiction. First, may a Rule 41(e) motion be brought "independently," or must the motion be brought *only* within the context of a separate civil action or pending criminal case? Second, what role, if any, is contemplated for a magistrate judge under Rule 41(e)?

### A. Can a Rule 41(e) Motion Exist As an "Independent Matter"

The court's holding in *6731 Kennedy Avenue* would seem to suggest, and the government argues, that a motion under Rule 41(e) can *only* be brought within the context of a criminal or civil case. In contrast, the movant argues that a motion under Rule 41(e) can exist independent of either a civil or criminal case.

Initially, the court notes that there are several cases in which Rule 41(e) motions were filed "independent" of a pending civil or criminal case, either under the magistrate judge's docket, or under the "miscellaneous" docket. The miscellaneous docket, according to the *Guide to Judiciary Policies and Procedures*, Volume XI, Statistics Manual, Chapter V, encompasses those matters which are "ancillary and supplementary proceedings not defined as civil actions." *See e.g. In re One Hundred Fifteen Thousand Five Dollars in United States Currency*, 777 F.Supp. 418 (E.D.Pa. 1991) (filed under "Miscellaneous Docket"); *In re Motion for Return of All Monies Seized*, 1991 WL 183363 (S.D.N.Y.1991) (filed under "Miscellaneous Docket"); *In re Search Warrants Concerning National Insurance Consultants Incorporated*, 139 F.R.D. 684 (D.Colo.1991) (filed under same Magistrate Judge's Docket as the initial warrants); *In re Seizure of Four (4) DC–3 Aircraft*, 134 F.R.D. 251 (E.D.Wis.1991) (filed under same Magistrate Judge's Docket as the initial warrants). Notably, with the exception of *National Insurance Consultants Incorporated*, the court in each of these cases deferred to pending administrative or civil forfeiture actions or criminal actions. Interestingly, however, the court in *National Insurance Consultants Incorporated*, 139 F.R.D. at 685, in considering a motion for the return of property deferred, in part, to the magistrate judge who initial-

ly issued the search warrants which led to the seizure of the business records.

Moreover, within the context of a search or seizure warrant, the concept of court action "independent" of a pending criminal or civil case is not novel. The court routinely issues such warrants without a pending criminal or civil case, including of course, the warrant which resulted in these proceedings.

Additional support for the proposition that a Rule 41(e) motion may be filed independent of a pending criminal or civil case can be found by analyzing Rule 41 itself. It is a self-contained rule which starts by conveying the authority to issue warrants (¶ (a)), establishes the scope of warrants and procedures for issuance (¶ (b), (c)), sets forth the manner in which property is to be seized and inventoried (¶ (d)), establishes procedures for the return of the property (¶ (e)) and addresses the manner for challenging the use of the property as evidence in criminal proceedings (¶ (f)).

The government, in effect, takes the position that the court may act "independent" of a pending civil or criminal case under the first paragraphs of Rule 41, when it is the government that seeks action, but not under paragraph (e), when it is the aggrieved party seeking action. Rule 41, establishing procedures for searches and seizure of property, is complete within itself; that is, the rule addresses the processing of property suspected of being tied to criminal activity from the initial government seizure to ultimate disposition and evidentiary use of seized property. It logically follows that if Rule 41 authorizes "independent" court action on behalf of the government, the same would be available to the party aggrieved by the government's action.

The view that Rule 41 allows court action independent of a pending civil or criminal case also finds support in the Notes of the Advisory Committee on Rules accompanying the rule. The Notes accompanying the 1972 amendments to Rule 41(e) discuss the distinction between a pre-indictment Rule 41(e) motion brought in the district in which the property was seized, and a post-indictment Rule 41(e) or (f) motion brought in the district in which the criminal case is pending. The Committee advises that the ruling on a motion brought in the district of seizure "is likely always to be tentative[, and is best treated as] interlocutory." Of course, this interlocutory status is closely parallel to the status of the seizure warrant which initiated these proceedings in the first instance in that, at the time the warrant issued there were no civil or criminal proceedings pending.

Rule 41(e) is not intended to deny the United States the use of evidence, *see* Advisory Committee Notes accompanying 1989 Amendment to Fed.R.Crim.P. 41, and the ultimate disposition of property under a Rule 41(e) motion is subject to further review if the government pursues criminal charges or civil forfeiture. A pre-indictment Rule 41(e) motion is really only a request for the modification in the terms of the warrant which was issued by the magistrate judge in the first instance. It is not a dispositive matter in either a criminal or civil context.

In this case, there is no alternative pending civil lawsuit, criminal charges are not imminent, and the government has not suggested an alternative administrative forum in which Pittman may seek relief; the court concludes that it is appropriate to proceed to consider the proposed modification in the seizure as an independent matter.

### B. Is This a Matter Within the Jurisdiction of the Federal Magistrate Judge?

■ The next question, even if the movant may seek relief without filing an independent lawsuit, is whether a magistrate judge is empowered to consider the motion. Again, the best place to start looking for an answer is in the rule. Prior to the 1989 Amendment, Rule 41(e) read, in part, as follows:

**(e) Motion for return of property.** A person aggrieved by an unlawful search and seizure may move the district court for the district in which the property was seized for the return of the property on the ground that he is entitled to lawful possession of the property which was

illegally seized. The judge shall receive evidence on any issue of fact necessary to the decision of the motion ...

Rule 41(e) now reads that "a person aggrieved by ... *the deprivation of property* may move the district court for the district in which the property was seized for the return of the property ... *The court* shall receive evidence on any issue of fact necessary to the decision of the motion." (emphasis added).

The issue raised by the government is whether, under Rule 41(e), Fed.R.Crim.P., "the court" to which an aggrieved person looks is restricted solely to district judges or meant to encompass magistrate judges as well. "Court", in common parlance, either refers to the people or the place; i.e. the building or room in which justice is administered, or the persons in whom is vested the authority to decide causes or exercise powers appropriate to the administration of justice. Historically, the term "court" in a federal context may have referred only to district judges. However, as discussed by Kent Sinclair Jr., Practice Before Federal Magistrates, § 1.03 at 1–8 (1992), "[t]he present system of United States magistrate[ judges] serving on United States District Courts was created in the Federal Magistrates Act of 1968, a law designed to 'reform the first echelon of Federal judiciary into an effective component of a modern scheme of justice.'" "The jurisdiction which a magistrate [judge] exercises is that of the district court itself, delegated to the magistrate [judge] by the judges of the court under governing statutory authority and local rules of court ... A magistrate is a subordinate judicial officer of the district court." *Id.* § 2.01 at 2–1, 2–2.

 The recent trend has been to vest increasing responsibility and authority in the magistrates, and in 1990, Congress officially changed the title of magistrate to magistrate judge, which is believed will "help educate attorneys and litigants about the magistrate judges' status as authoritative judicial officers within the federal courts." Christopher Smith, *From U.S. Magistrate to U.S. Magistrate Judges* 75

Judicature 210, 212 (1992); *See also, Gomez v. United States*, 490 U.S. 858, 109 S.Ct. 2237, 2244, 104 L.Ed.2d 923 (1989). Of course, since magistrate judges are not empowered under Article III, there are limits upon their authority, particularly regarding felony criminal trials. *See Gomez v. United States*, 109 S.Ct. at 2245–6 (1989). Consequently, in some areas of law, particularly those in which magistrate judges are not empowered to act, or are restricted in their actions, the term "judge" is used to specifically preclude or indicate a limited role for magistrate judges. For example, Rule 16(b), Fed.R.Civ.P., states "Except in categories of actions exempted by district court rule as inappropriate, *the judge, or a magistrate when authorized* by district court rule, shall ... enter a scheduling order ..." (emphasis added). The Advisory Committee Notes accompanying the 1983 Amendment to Rule 16 state that the "use of the term 'judge' in subdivision (b) reflects the Advisory Committee's judgment that it is preferable that this task should be handled by a district judge rather than a magistrate, except when the magistrate is acting under 28 U.S.C. § 636(c)."

In fact, in the Notes accompanying the 1989 amendments to Rule 41, recited by the court in *6731 Kennedy Avenue* state:

> The word "judge" is changed to "court" in the second sentence of subdivision (e) to clarify that a magistrate may receive evidence in the course of making a finding or a proposed finding for consideration by the district judge.

Similarly, it would seem that the word "court" in the first sentence of subdivision (e) would refer to judges and magistrates; if the drafters intended that the word "court" in the first sentence was to have a different meaning from the use of the same word in the second sentence, it would have been a simple matter to have substituted the word "judge" or "district judge" for court in the first sentence. Then, the rule would have read that the aggrieved party may move the district judge, but the "court" (magistrate judge or district judge) may receive evidence on the motion.

Notwithstanding, the court in *6731 Kennedy Avenue*, relies upon the above sentence from the Notes in support of its position. The court, after reciting the above language, proceeded to determine that the magistrate judge was without jurisdiction, apparently interpreting the Notes to mean that the magistrate judge's finding or proposed finding was for consideration by the district judge.

Contrary to the conclusion reached by the court in *6731 Kennedy Avenue*, it is the opinion of this court that magistrate judges have jurisdiction over Rule 41(e) motions. The Notes indicate that "a magistrate may receive evidence in the course of making a finding," (connoting a decision as opposed to a recommendation) or a magistrate may receive evidence in the course of making "a proposed finding for consideration by the district judge." There would have been no reason to remove the term "judge" if the drafters of the amendment wanted the rule to empower only Article III judges to resolve Rule 41(e) motions; without the change, there is nothing which would have precluded a judge from referring a matter to a magistrate for a recommendation.

This reading is consistent with the language included in the Magistrates Act, 28 U.S.C. § 636. Section 636(b)(1)(B) authorizes district judges to refer matters to a magistrate judge to conduct a hearing and submit to the judge "proposed findings of fact and recommendations for the disposition" of a motion. If, under Rule 41(e), the magistrate judge was limited to taking evidence only for consideration by a district judge, there would be no distinction between a finding and a proposed finding, and the use of both would be superfluous. Thus, use of the term "finding", together with the term "proposed finding" means that the former refers to the situation where the magistrate judge is exercising primary jurisdiction and making a decision.

Finally, the scope of authority of magistrate judges is often defined by the local rules of the district court. Local Rule 13.06 of the Eastern District of Wisconsin authorizes magistrates to perform a variety of "other" duties, including the catch-all, "any additional duties consistent with the Constitution and laws of the United States." *See* 28 U.S.C. § 636(b)(3). Local Rule 4 addresses the assignment of matters within the Eastern District, although as the government notes, Pittman's motion does not fall under a pending civil case (Local Rule 4.01) or a pending criminal case (Local Rule 4.02). However, Local Rule 4.04 specifies that "[a]ll other matters within the authority of the magistrate ... are assigned directly to the magistrate." It is under this automatic reference provision that the magistrate judges handle the issuance of subpoenas, the appointment of counsel, impanelling grand juries and receiving its returns and numerous of the "other duties" listed in Rule 13.06.

This matter is within the authority of the magistrate judge, both under the terms of the Federal Rules of Criminal Procedure and under the terms of the Local Rules; accordingly, it is a matter properly within the magistrate judge's jurisdiction.

## II. *Factual Background*

Having determined that this is a matter which is properly before this court, attention is directed to the merits of the motion. Again, Rule 41(e) provides that a "person aggrieved by ... the deprivation of property may move ... for the return of the property on the ground that such person is entitled to lawful possession of the property ... If the motion is granted, the property shall be returned to the movant, although reasonable conditions may be imposed to protect access and use of the property in subsequent proceedings." In order to form the factual basis upon which to resolve this motion, the court held an evidentiary hearing and now makes the following findings of fact.

On May 21, 1991 Special Agent Michael L. Spang of the Internal Revenue Service filed an application for a search warrant for various records of Bee Bus Lines, Inc. located at the premises of the company. In his application for the search warrant, Spang states that he is conducting an administrative tax fraud investigation of Judith Boyd, James Pittman, and Bee Bus

Lines. Pittman is a 51% shareholder of Bee Bus Lines and Judith Boyd is a 49% shareholder. In the summary of his affidavit offered in support of the search warrant, Spang concludes "that there is probable cause to believe that violations of the criminal statutes have been committed, to wit, (a) a failure to file corporate income tax returns for Bee Bus Lines, Inc. for 1987 through 1989 in violation [of] Title 26, United States Code, Sections 7201 and 7203; and (b) Boyd's failure to file individual income tax returns for the years 1987 through 1989 in violation of Title 26, United States Code, Sections 7201 and 7203. Further, there is probable cause to believe that evidence (described in Attachment B) of the commission of these offenses is located on the premises" of Bee Bus Lines. Notably, Spang does not mention the existence of probable cause that James Pittman had committed any crimes.

Attachment B lists, among the items to be seized as evidence, currency and any other evidence and instrumentalities of the crimes alleged. In the narrative portion of his affidavit, Spang relates that, based upon information from a confidential informant, Judith Boyd has kept a large amount of United States currency in a standing floor safe in the basement of Bee Bus Lines. At the hearing, agent Spang testified that the confidential informant told him that he or she had seen Judith Boyd regularly enter the safe, and that there was $10,000 or more in the safe, based upon a visual estimate.

The agents entered the premises of Bee Bus Lines on May 24, 1991 to execute the search warrant. Approximately forty five minutes after the agents began the search, James Pittman arrived. During the course of the search, the agents went into the basement office where the confidential informant had said the safe would be located. Upon entering the office, the agents discovered two safes, several feet apart. An employee of Bee Bus Lines opened one of the safes. Spang does not know who specifically opened the safe, but it was not Pittman, and Pittman asserts that the only individuals with combinations to that safe are himself, Judith Boyd and Robert Boyd.

Inside, Spang found a coin and silver certificate collection, between four and five hundred dollars in cash, which Robert Boyd claimed was from his paycheck, and miscellaneous records.

Agent Spang testified that the agents conducting the search had unsuccessfully asked several people to open the second safe, so Spang ordered a locksmith to open the safe. However, before the locksmith set to work, Pittman agreed to open the safe. Pittman testified that this was his personal safe and that he was the only individual who knew the combination. Inside the "second safe," Pittman's alleged personal safe, the agents found $111,739, bank account passbooks, and a check register for the ABC Corporation, Inc. No Bee Bus Lines' records or documents were found in the safe. Judith and Robert Boyd both indicated to Spang that the money in the safe belonged to Pittman. After its seizure, the currency was analyzed, photographed and was ultimately taken to a bank in Chicago and deposited in an interest bearing federal reserve Internal Revenue Service account, whereupon the specific currency was reintroduced into general circulation.

Special agent Spang obtained a copy of the Bee Bus Lines, Inc. corporate tax return for 1990, which was filed late on September 18, 1991, after the search of Bee Bus Lines. Spang stated that he did not know if the corporation had obtained an extension on its filing. Spang testified that the tax return shows an increase in corporate "[o]ther current assets" from the beginning of 1990 until the end of 1990 in the amount of $210,710, and that $133,364 of that amount was owed to the corporation by the shareholders. There was also $127,067 in gross receipts that were not previously booked by the corporation.

Based upon this information, Spang believes that $127,067 had been diverted from the corporation to the shareholders, and he speculated that had the warrant not been executed, the corporation would not have reported the diversion of funds on its tax return. Furthermore, the currency could

be subject to forfeiture or used to pay a civil tax assessment.

### III. Analysis

"Reasonableness under all of the circumstances must be the test when a person seeks to obtain the return of property." Advisory Committee Notes accompanying 1989 amendments to Rule 41(e). As discussed in this court's November 18, 1991 order in this case, the Seventh Circuit, in *Mr. Lucky Messenger Service, Inc. v. United States*, 587 F.2d 15 (7th Cir.1978) and *Interstate Cigar Co. v. United States*, 928 F.2d 221 (7th Cir.1991), found jurisdiction entirely upon equitable grounds, whereas, the 1989 amendments to Rule 41(e), creating a remedy for any person aggrieved by the "deprivation of property", is the source of jurisdiction in this case. Nevertheless, the 1989 amendments to the rule do not necessarily dispense with the equitable factors discussed in *Mr. Lucky Messenger Service* and *Interstate Cigar*. In those cases, applying the equitable factors, the court considered the movant's individual interest in and need for the material whose return it seeks, the likelihood of irreparable injury if the property is not returned, and the availability of an adequate remedy at law for redress of its grievance. *Interstate Cigar*, 928 F.2d at 223. However, once equitable jurisdiction was established, the burden was on the government to show why the property should not be returned. *Id.* at 224.

*Mr. Lucky Messenger Service* and *Interstate Cigar* offer the extremes—the movant bears a substantial burden of satisfying the equitable factors test, and once this burden is met, the government must justify its continued retention of the movant's property, or return it. *See Mr. Lucky Messenger Service*, 587 F.2d at 18; *Interstate Cigar*, 928 F.2d at 224; *see also, Sovereign News Co. v. United States*, 690 F.2d 569 (6th Cir.1982), *cert. denied*, 464 U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983).

■ The definition of reasonableness cannot be found in a vacuum. It must be viewed as a continuum, based upon the facts and circumstances of each case. *See e.g., United States v. Chaidez*, 919 F.2d 1193, 1197 (7th Cir., 1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2861, 115 L.Ed.2d 1028 (1991) (discussion of reasonableness of seizure of a person as measured along a continuum). Thus, while the factors on either extreme of the continuum, as articulated in cases such as *Mr. Lucky Messenger Service*, 587 F.2d at 17, play a role in determining what is reasonable, it is likely that most requests under Rule 41(e) will fall between the extremes. For that reason, the posting of a performance bond may be appropriate in some cases, or the retention by law enforcement officials of photocopies of original seized documents may be reasonable. *See* Advisory Committee Notes accompanying 1989 Amendment to Rule 41(e).

■ Here, however, the parties focus on the extremes. Pittman wants the unconditional return of his property; the government will accede to reasonable conditions placed upon the return, but urges the unencumbered retention of the property while the investigation is underway.

Turning now to the application of the equitable factors, the first question is whether Pittman has established an individual interest in the currency. *Interstate Cigar*, 928 F.2d at 223. The court need not dwell on this point long. In support of Pittman's individual interest is the fact that the safe contained only the money and Pittman's personal documents, and nothing which could be associated with Bee Bus Lines. Pittman was the only person with the combination to the safe, and nobody but Pittman has claimed an ownership right to the money. Judith Boyd and Robert Boyd both stated to Spang that the money belonged to Pittman.

The government makes an attempt to cast doubt on Pittman's alleged ownership rights by asserting that the confidential informant had seen large amounts of currency (estimated at $10,000 or more) in the safe Judith Boyd utilized. Since only the second safe had more than $10,000, the government asserts that this is the safe that must have been used by Boyd. Interestingly, according to Spang's affidavit, the confidential informant only mentions one

safe, the one that he or she had seen Boyd utilize. The government, which has control over the identity of the informant, did not offer any clarification regarding the existence of a second safe. Judith Boyd and her son, Robert, both acknowledged that property in the first safe, which they used, was the corporation's and both stated to Spang that the $111,739, found in the second safe, was Pittman's. Based upon the evidence presented, the informant was clearly referring to the first safe which was denominated as the one belonging to Bee Bus Lines. No one has disputed that this is the only safe to which Boyd and others had access. For whatever reason, there was a substantial sum of money in the safe identified as Pittman's. The location of the money cannot change the character of the two safes. The money was in Pittman's safe and for the foregoing reasons, the court is satisfied that Pittman has substantiated an individual interest in the currency.

Next, the court considers Pittman's need for the currency and the likelihood of irreparable injury if the money is not returned. Pittman does not claim any specific or imminent harm from the deprivation of his finances. However, "[w]henever the government seizes a significant amount of money and withholds it for an unreasonable amount of time without bringing charges and without offering evidence to justify its continued withholding and without any indication as to when if ever charges will be filed, the plaintiff suffers irreparable harm." *Mr. Lucky Messenger Service* 587 F.2d at 18. Thus far, over ten months have passed since the seizure. The government indicates that investigations into the sort of charges which may eventually be brought against Pittman take eighteen to twenty four months at the preliminary stages, and another twelve months through the review stage before the charges are actually filed, so it appears that it may be another 20 months or more before charges would be filed.

The government offers little evidence in support of eventual charges against Pittman. Spang's affidavit offered in support of the search warrant states that the government is conducting an administrative tax fraud investigation against Judith Boyd, James Pittman and Bee Bus Lines for violations of 26 U.S.C. § 7201 and § 7203, which proscribe the failure to file income tax returns. The government claims that neither Judith Boyd nor Bee Bus Lines filed income tax returns for 1987, 1988 and 1989, but the government has offered no evidence which suggests that Pittman failed to file income tax returns.

■ The government alleges that Pittman may have diverted corporate funds to the shareholders. "Once a taxpayer has taken control of funds diverted from a corporation and then fails to report such funds as income or to make any adjustment in the corporate books to reflect a return of capital, that is sufficient to imply willful intent to evade taxes." *United States v. Toushin,* 899 F.2d 617, 624 (7th Cir.1990); *quoting United States v. Thetford,* 676 F.2d 170, 175 (5th Cir.1982). Income becomes taxable when the taxpayer has the freedom to dispose of it at will, to the exclusion of any of the rights in the money asserted by the corporation. *United States v. Toushin,* 899 F.2d at 622.

Arguably, *if* the money found in the safe was corporate income, and Pittman has stated that it is his personally, Pittman has taken control of the funds. However, this alone is not illegal; any time a corporation pays a dividend, a shareholder has taken control of funds properly diverted from the corporation. Furthermore, Pittman argues that the dominant shareholders of a corporation can not be held to have embezzled or stolen funds from their own corporation, since they would be taking money from themselves. Needless to say, they would also be taking money from the minority shareholders, but this argument misses the focus of the government's position which centers on Pittman's potential tax liabilities, and the possibility that Pittman is avoiding tax payments on diverted funds.

■ It is the failure to report funds as income, or to make any adjustments in the books to reflect payments to shareholders

which implies an intent to evade taxes. *United States v. Toushin*, 899 F.2d at 624. The government has not presented any evidence concerning what funds Pittman did or did not report as income. Special agent Spang contends that there was an improper diversion because there were items not recorded in the books. The only evidence which the government offered is the Bee Bus Lines corporate tax return for 1990, which shows a change in corporate "[o]ther current assets" from zero at the start of the year to the amount of $210,710 at the end of the year; of this amount, $133,067 reflects money owed to the corporation by the shareholders, and $127,067 of that reflected an increase in gross receipts that the corporation did not previously book or record in the corporate books.

The Bee Bus Lines corporate tax returns were filed within the time limits of an automatic six month extension, after the search was conducted in May, 1991. Spang testified that he believed the $127,067 to be money diverted to the shareholders which, but for the government executing the search, would not have been included on Bee Bus Lines tax return. The fact that the funds were belatedly recorded is not *per se* proof that any taxes were evaded. Arguably, the fact that the funds were eventually recorded, even belatedly, suggests that taxes were not evaded. Aside from the tax return, the government has not presented any evidence of tax evasion by Pittman.

■ In sum, the government has presented evidence of a large accumulation of cash and belated adjustments in the books to reflect additional income and payments to shareholders. While it could be true that the adjustment in the books might not have occurred if Pittman had not been alerted to the government's suspicions, the fact is that the tax returns do reflect the income and the payments to shareholders. The government did not present any financial records which support an allegation of tax evasion, and no evidence that Pittman ever failed to file a tax return or failed to declare income. Charges of tax evasion can be proven by

showing that cash expenditures exceed cash sources. *United States v. Toushin*, 899 F.2d at 619–620, and the government argues that the accumulation of large amounts of currency is relevant to the prosecution of criminal tax evasion. While this may be true, the accumulation of large amounts of cash is not, standing alone, proof of a crime.

The next of the equitable factors is the availability of an adequate remedy at law for redress of Pittman's grievance. *Interstate Cigar*, 928 F.2d at 223. Even if the court allows the government to continue its retention of the cash, Pittman is likely to have an adequate remedy for redress of his grievance. *Interstate Cigar*, 928 F.2d at 223. Unlike the situation where the government retains important documents, which may result in an unquantifiable harm upon the aggrieved party, the property retained here is cash, and the money is being held in an interest bearing account.

These factors are balanced against the government's justification for continuing retention of the money, including the specific nexus between the property seized and the continuing criminal investigation. *Interstate Cigar*, 928 F.2d at 223–4.

Unquestionably, the money itself has no evidentiary value, since the physical currency was reintroduced into general circulation when the government deposited the cash in a Chicago bank. The only continued justification for the retention of the money is the possibility that it may, in the future, be subject to forfeiture or tax assessment. The government has not indicated the specific basis for forfeiture or addressed whether the full amount would be subject to forfeiture, and as discussed above, the government's theory of culpability on Pittman's part is largely unsubstantiated by evidence. Certainly, had the government sought a seizure warrant of these funds from Pittman on the basis of the evidence presented, the request for a warrant would have been denied.

The court solicited proposals for reasonable conditions which might be set to govern the return of Pittman's money. Pittman has not made any suggestions, argu-

ing instead for the unconditional release of the money. The government's opportunity to present evidence which would justify its continued retention of Pittman's cash has passed, and it is more than ten months since the initial seizure. In light of the government's scant evidentiary showing, the continued retention of Pittman's funds, in the absence of any pending or imminent charges, is unreasonable. Therefore, the court will order the return of the $111,739 together with any interest earned to Pittman.

IT IS THEREFORE ORDERED that the motion for return of property is GRANTED, and the government shall return the $111,739 to James A. Pittman, together with any earned interest within 15 days from the date of this order.