January 6, 1998 Final pretrial conference.

April 21, 1998 Trial commences.

NOTE: THIS SCHEDULE CONTAINS ONLY THE MAJOR DATES AND DOES NOT INCLUDE ALL DEADLINES ENUMERATED IN THE ORDER. IF THERE IS A CONFLICT BETWEEN THIS SCHEDULE AND THE ORDER, THE ORDER SHALL GOVERN.

**In re the Matter of PROPERTY SEIZED FROM ICS CUTTING TOOLS, INC.**

Nos. 94–102M(AEG), 95–001M(PJG).

United States District Court,
E.D. Wisconsin.

Aug. 3, 1995.

Joseph R. Wall, Assistant U.S. Attorney, for plaintiff.

Kevin R. Williams, O'Donnell, Byrne & Williams, Chicago, IL, Franklyn N. Gimbel, Milwaukee, WI, for defendant.

### DECISION AND ORDER

GOODSTEIN, United States Magistrate Judge.

On July 22, 1994 and January 28, 1995, United States Customs Agents executed searches of the premises at ICS Cutting Tools, Inc. (hereinafter "ICS") pursuant to search warrants. Documents, machinery and inventory were seized. On March 14, 1995, ICS moved for the return of property pursuant to Rule 41(e). This court has jurisdiction over a Rule 41(e) motion for the return of property. *See In re Search of 4330 N. 35th Street, Milwaukee, Wisconsin,* 142 F.R.D. 161, 164–66 (E.D.Wis.1992).

On May 23, 1995 and May 30, 1995, the court conducted a Rule 41(e) hearing with respect to the seized inventory, which is the only remaining unresolved issue. Testifying on behalf of the government was United States Customs Agent Robert Becker. Testifying on behalf of ICS were ICS President John Jaconi, Stanley Olander, an expert in plating metals, Wayne Gmeiner, a retired machine builder; and R. Kevin Williams, an attorney for ICS. The following constitutes this court's findings of fact and conclusions of law.

### I. Factual Background

ICS Cutting Tools, Inc. is a manufacturer and distributor of cutting tools located in Casco, Wisconsin. In March, 1994, based upon the statements of two former employees of ICS, U.S. Customs Agent Robert Becker began investigating ICS for violation of 19 U.S.C. § 1304 which prohibits removal of foreign country of origin markings from imported goods. As a result of Becker's investigation, the two search warrants which are the subject of this matter were issued and executed. The existence of probable cause for the issuance of those warrants is not being challenged by ICS, and that issue is not the subject of this decision. As stated at the outset, the only issue addressed at the hearing is whether ICS, a "person" aggrieved by the seizure of its inventory as a result of the two searches, is entitled to its return. *See In the Matter of the Search of 4330 N. 35th Street, Milwaukee, Wisconsin,* 142 F.R.D. 161, 163–64 (E.D.Wis.1992) (a Rule 41(e) motion may be filed independent of a pending civil or criminal case wherein a person deprived of property seeks its return).

At the hearing, it was established that ICS obtains many of its cutting tools, which include drill bits, taps, dies and reamers, from foreign countries. These tools may or may not be marked with the country of origin. It is the position of ICS that, except for some tools which are sold in their imported condition, the majority of such tools are subject to a "remanufacturing" process of ICS. ICS contends that, as a result of this process, the cutting tools have been "substantially transformed." The government disagrees and contends that while ICS may refine these cutting tools, its efforts do not constitute a substantial transformation.

John Jaconi, president of ICS, testified that when goods have been "remanufactured", the country of origin markings are removed from those tools. Jaconi referred to this as the "Meta Matrix Process," a process by which ICS obtains base inventory and converts it to the specific requirements of the customer. ICS presented a video which showed the following basic procedures: ICS acquires tools, inspects them, cleans them, and puts them in an oil solution to protect and preserve the tool from rust or hand oil. The tools are then held in stock until a use is determined for them. The cleaning process encompasses cleansing and grinding of the tools. Jaconi admits that the grinding of the tools removes the country of origin markings which had been etched on the tool. The question then arises as to whether this removal violates federal law such that the government is entitled to seize and retain these items as derivative contraband. *See Cooper v. City of Greenwood,* 904 F.2d 302, 304, 305 (5th Cir.1990) (defining contraband *per se* to include objects which are "intrinsically illegal in character," where-

as derivative contraband would include items which are not inherently unlawful, but may become unlawful depending upon their use).

There are four categories of tools which are allegedly "remanufactured," and, as the process differs with respect to each, the court will discuss each category separately.

### A. Drill Bits

Jaconi testified that drill bits make up between sixty and seventy-five percent of ICS's business. Jaconi testified that ICS purchases fluted drill blanks which are made into whatever drill bit the customer requires. Wayne Gmeiner, who specializes in grinding drill bits, testified that 200 tools could be created from the fluted drill blank labeled as Exhibit 31A and that he had seen 70,000–80,000 pieces similar to this at ICS at one time. Gmeiner testified that this could be accomplished by changing the shank, the angle of the flutes, the points, the clearance and the land of the drill bit in different ways, all of which is generally referred to as "pointing." Gmeiner testified that he taught ICS workers how to do pointing and assisted Jaconi with buying the proper equipment.

Jaconi testified that ICS starts off with the fluted drill blank, in Exhibit 31A, points it, and then gives it the type of finish requested, a titanium, zirconium or black oxide coating. Both Jaconi and Gmeiner testified that, before they are pointed and finished, the fluted drill shanks are not functionally usable tools. Jaconi showed a videotaped demonstration and then recreated the demonstration in the courtroom in order to show the initial uselessness of these drill bits. He attempted to drill metal with three different drill bits. The fluted drill blank, labeled Exhibit 36A, could not drill through the metal whereas the other two, which had been modified by ICS and labeled Exhibit 36B and 36C, could. Stanley Olander, who is familiar with various coating and finishing processes, testified that a black oxide finish stops corrosion, enhances performance and adds lubricity aside from also adding aesthetic value. Jaconi testified that black oxide is a form of low stress heat treatment.

In addition to these drill bits, the government also seized a group of small drills bits called jobber drill bits. Jaconi testified that these drill bits are simply repackaged by ICS which places them in envelopes, inserts an ICS card in the envelope, places a sticker on the outside which indicates "imp" for import and then and ships them to the customer. In interviewing Barb Chosa, an ICS employee, Agent Becker was told that she removed the drill bits from their original box marked "Made in China", for example, and repackaged them in envelopes with a card identifying ICS as the source.

### B. Taps, Dies and Reamers

With respect to taps, Jaconi testified that there is a market for imported taps. When ICS receives a contract for import tools, Jaconi testified that ICS does not do additional work on the product but merely inspects it and then sends the product out as received. With respect to these goods, any country of origin markings would remain on the goods and therefore these goods are not goods in issue in this case. Otherwise, the taps undergo the Meta Matrix process and are converted depending upon what the customer requests. For most taps, Jaconi testified that the points were removed. ICS also changes the threading, depending on the future use of the taps, and then will put an oxide coating on it. Jaconi also testified that the taps are "heat treated," a process which consists of placing the tool in an oven for a period of time. The larger the tool, the longer it remains in the oven. Jaconi has two ovens for this purpose.

Jaconi testified that after being inspected and cleaned, the dies are surface treated with oxide. Additionally, all dies except hex dies are "heat treated." There was little evidence as to the process undergone by reamers, other than an employee of ICS, Al Ferron's testimony that the country of origin marking is ground off and Exhibit 5 which is a chucking reamer etched with the words "ICS WI" and no other country of origin markings.

### II. Analysis

Rule 41(e) allows for a person who has been aggrieved by an unlawful search and seizure, or who has been deprived of proper-

ty, to move for return of the property on the ground that the person is entitled to lawful possession of the property. ICS claims to have been aggrieved by an unlawful search. ICS essentially argues that, because the inventory seized was substantially transformed, no country of origin marking was required. Thus, ICS argues, the inventory seized was not contraband and therefore its seizure was illegal.

To the extent that ICS has raised an issue regarding the legality of the search, it is not a challenge that questions the existence of probable cause for issuance of the search warrants. Even finding retrospectively that all, or a portion, of the inventory seized does not constitute contraband, the court cannot at this time conclude that the search of ICS and seizure pursuant to the warrant was illegal.

■ The court will therefore consider whether ICS, which has clearly been deprived of its property, is entitled to lawful possession of the inventory. First, the court must determine whether or not the inventory constitutes derivative contraband; if so, it would not be lawful for ICS to possess same. Theoretically, mere possession itself by ICS might not be unlawful, but under the attendant circumstances, here possession means possession with intent to sell. If this hurdle is surpassed and return of the property is contemplated, then the court must balance the competing interests of the government and ICS. "Reasonableness under all of the circumstances must be the test when a person seeks to obtain the return of property." Advisory Committee Notes accompanying 1989 amendments to Rule 41(e). "If the United States has a need for the property in investigation or prosecution, its retention of the property generally is reasonable. But, if the United States' legitimate interests can be satisfied even if the property is returned, continued retention of the property would become unreasonable." *Id.*

■ 19 U.S.C. § 1304 provides that, unless excepted, every article of foreign origin imported into the U.S. shall be marked in a conspicuous place as legibly, indelibly, and permanently as the nature of the article or its container will permit, in such a manner as to indicate to the ultimate purchaser the name of the country of origin of the article in English. As defined in 19 C.F.R. § 134.1(d), the "ultimate purchaser" is generally the last person in the U.S. who will receive the article in the form which it was imported. However, where a manufacturer or processor subjects the imported article to a process which results in a "substantial transformation" of the article, the manufacturer or processor may be the "ultimate purchaser" and the article will thus be exempted from marking. 19 C.F.R. §§ 134(d)(1) & 134.35(a). Under the principle of *United States v. Gibson–Thomsen Co.*, 27 C.C.P.A. 267, C.A.D. 98, 1940 WL 4085 (1940), a substantial transformation occurs where a manufacturer or processor in the United States converts or combines an imported article such that the new article has a name, character, or use different from that of the imported article. "To determine whether a substantial transformation of an article has occurred for purpose of ascertaining who is the 'ultimate purchaser' each case must be decided on its own particular facts." *Uniroyal Inc. v. United States,* 542 F.Supp. 1026, 1029, *aff'd,* 702 F.2d 1022 (1983). The court must determine whether the tools seized from ICS have been "substantially transformed" so as not to require a county of origin marking.

■ With respect to the fluted drill blanks, Jaconi and Gmeiner testified that these drill blanks, as imported, were incapable of drilling any surface. ICS used these blanks to make hundreds of variations of bits which could perform different functions. Indeed, a demonstration by Jaconi revealed that the blanks as imported could not drill into any surface, but that the type of pointing of the bits resulted in the function of the drill. In Administrative Ruling 733882, 1991 WL 519900; 1991 U.S. Custom HQ LEXIS 3103, HQ733882 (July 25, 1991) (the "Michigan Drill" ruling), the director of the Customs Commercial Rulings Division held that the drill blanks manufactured in Korea and Taiwan were substantially transformed because, after the blanks were processed by Michigan Drill, the character and use of the blanks changed. As in the *Michigan Drill* ruling, the pointing of the drills by ICS

produces drill bits with widely differing applications, thus changing the use and physical character of the bits. Becker's opinion that the drill blanks were not substantially transformed is not entitled to great weight in that Becker, who has no personal experience or education concerning this industry, based his conclusions upon the visual inspection of the tools and the opinions of others on the definition of substantial transformation.

The government, however, argues that this case is analogous to a confidential 1993 opinion attached to its brief, in which the Customs Service concluded that the processing of drill bits was not a substantial transformation of imported articles. The government submits that this opinion casts doubt on the validity of the *Michigan Drill* ruling. ICS objects to the government's submission of a confidential Customs opinion in its post-hearing brief on the grounds that, as a confidential opinion, it carries no weight and because ICS has not had an opportunity to present evidence and argument with respect to that opinion. This court is reluctant to put any weight in a redacted confidential opinion. In any event, this confidential opinion states that the facts presented are distinguishable from *Michigan Drill* (HQ733822), and this court similarly believes that the facts in the confidential opinion are distinguishable from ICS.

In the confidential opinion, the Customs Service based its determination that items had not been substantially transformed on the fact that "the only work done to the drill bits in the U.S. is the putting on of the point by grinding; stamping the log, country of origin and other information; and inspection and packaging." See pp. 3, 5. The opinion distinguishes *Michigan Drill* where the surfaces of the drill blanks were subjected to more than just pointing and where there was evidence that the process changed the bits into specialized articles which could perform different functions. See pp. 6, 7. Unlike in the confidential opinion, here there has been testimony that the drill blanks are modified in many different ways to create 200 different tools, in addition to undergoing a heat treatment and finishing process. This case is thus more analogous to *Michigan Drill*. Ac-

cordingly, the court is of the opinion that the fluted drill blanks have been substantially transformed.

■ ICS asserts that the jobber drill bits which were seized are exempted from the requirement of a country of origin marking by the C.F.R. "J" list because they are too small. Even assuming that the bits meet the "J" list criteria, the exemption requires that the outermost container in which the article reaches the ultimate purchaser be marked to indicate the origin of its contents. 19 C.F.R. § 134.33. Jaconi testified that the outer labels only say "imp" which may indicate importation, but fail to indicate the country of origin. As the jobber drill bits have not been substantially transformed and do not comply with the "J" list requirements, if sold without proper marking, this court believes that the bits would be considered as derivative contraband.

■ With regard to the taps, Jaconi testified that he receives two types of orders. The first type, those which are directly sent to the purchaser without any work done by Jaconi, are not relevant here as they would still display a country of origin marking. The second type of order is similar to the drill blanks in that Jaconi testified that the taps undergo the Meta Matrix process and are converted depending upon customer requirements. Jaconi testified to removing the points, changing the threading, heat treating and putting an oxide coating on it. Thus, where the country of origin markings are removed from the taps, the taps have been changed in physical character and use such that the court concludes that they have been substantially transformed.

■ As to the dies and reamers, ICS argues that the heat treatment and oxide treatment substantially transformed them because of the value those processes added. Jaconi claimed to have abided by a "fifty percent" value added rule—if he added a total value of fifty percent or more to the tool, then he believed that tool had been substantially transformed. In *National Hand Tool Corp. v. United States,* 14 Int'l Trade Rep. (BNA) 1252, 1254, 1992 WL 101006 (CIT 1992), *aff'd* 989 F.2d 1201, 1993

WL 22705 (Fed.Cir.1993), the court held that the character of the imported goods remained unchanged after heat treatment, electroplating and assembly, despite the necessities of these procedures in meeting Federal and American National Standards Institute standards for hand tools. The court also found that the increase in cost in the product as a result of these procedures inapposite in determining whether the goods are substantially transformed.

The testimony of Jaconi and Stanley Olander, an expert on metal finishes, support ICS's argument that heat treatment and oxide finish make a tool better and more valuable. However, this value added to the tool does not substantially transform it unless it changes the character, use or name. *See National Hand Tool Corp.*, 14 Int'l Trade Rep. at 1255. The court notes that there is a dispute as to whether the process Jaconi used was hot enough and long enough to constitute a "heat treatment." Even assuming that the process was such a "heat treatment," under *National Hand Tool Corp.*, this treatment did not change the character or use of the dies.

Moreover, the court finds Jaconi's testimony that the country of origin markings must be removed by grinding prior to heat treatment unpersuasive. Although Jaconi testified that the dies are ground, heat treated and then etched with the words "ICS WI" or "ICS USA," Becker videotaped ICS employee Al Ferron, who stated that the tools are etched prior to the heat treatment. In addition, when asked why only the country of origin marking was ground off of Exhibit 2, but not the size marking, Jaconi testified that country of origin etchings on a tool cause contamination and must be ground off, but a stamping of the size, which is deeper than an etching, does not cause such contamination. The court finds this explanation too self-serving and it will be accorded little, if any, weight. For the foregoing reasons, the court finds that ICS's treatment of the dies did not result in a change of name, use or character and thus those dies have not been substantially transformed. Likewise, assuming that reamers are subjected to the same process, which is not entirely clear from the testimony, they, too, have not been substantially transformed.

■ Now turning to the reasonableness balancing test, based upon the court's conclusions, it appears that the government's need to retain the seized inventory for further investigation or for prosecution, especially with respect to the blank drill bits and the dies, is not substantial. On the other hand, ICS has a strong interest continuing its business operations while the government pursues it investigation. As such, the court will grant ICS's motion for the return of property.

■ In granting ICS's motion, the court may still impose reasonable conditions to protect access and use of the property in subsequent proceedings. Rule 41(e), Fed. R.Crim.P. In fact, the government in its July 10, 1995, submission suggests various conditions that could be imposed if the property is to be returned. Imposition of conditions is especially important in this case where the ultimate finding on the issue of substantial transformation may be for another court. Thus, the court is not prepared to make a finding at this juncture that the items seized have no investigatory or evidentiary value to the government.

Accordingly, the court will order that the government return to ICS all of the inventory seized with the exception of representative samples which it may retain for use in future proceedings. The government may also take photographs or videotapes of the inventory prior to returning it to ICS. In addition, prior to reselling the dies and reamers, ICS must remark them with the appropriate foreign country of origin consistent with 19 U.S.C. § 1304. Furthermore, prior to reselling the jobber drill bits, ICS must label the outermost container with the country of origin in accordance with 19 C.F.R. § 134.33.

**IT IS THEREFORE ORDERED** that:

1. ICS's motion for return of property pursuant to Rule 41(e) is granted. The government must return all of the inventory seized from ICS within two weeks from this date, with the exception of a small representative sampling of the inventory which may be retained for use in further proceedings.

The government may also photograph or videotape all of the inventory before its return.

2. Prior to reselling the dies and reamers, ICS must remark them with the appropriate foreign country of origin consistent with 19 U.S.C. § 1304.

3. Prior to reselling the jobber drill bits, ICS must label the outermost container with the country of origin in accordance with 19 C.F.R. § 134.33.